STATE v. JOHN C. BIEHOFFER.

129 N. W. (2d) 918.

July 31, 1964—Nos. 38,202, 38,203.

*Harry P. Strong, Jr.*, for appellant.

*Walter F. Mondale,* Attorney General, *Charles E. Houston,* Special Assistant Attorney General, and *Herbert J. Cook,* County Attorney, for respondent.

SHERAN, JUSTICE.

Appeals from an order of the district court denying defendant's motion for a new trial.

On March 14, 1959, at about 1:30 a. m., men were observed entering the Eagles Club in Northfield, Minnesota, through a second-story window. The cash register was rifled. The police came but apprehension was evaded. Separate informations were filed, one charging defendant with burglary based on the entry and the other charging him with larceny based on the alleged taking of an amount in excess of $25 from the cash register. A consolidated trial of the two charges to which defendant objected resulted in verdicts of guilty. Defendant moved for a new trial, and this appeal followed the denial of his motion.

Defendant contends that the evidence does not sustain verdicts of guilty because the state failed to meet its burden of proving guilt beyond a reasonable doubt and because the testimony of Ziegfried Zaspel, an accomplice, was not adequately corroborated. In addition, it is urged that defendant was deprived of his constitutional rights, State and Federal, to a fair trial and due process of law because (a) Zaspel testified that he had met the defendant in prison; (b) an official of the State Bureau of Criminal Apprehension asserted during his testimony that defendant was immediately suspected of this crime; (c) the consolidated trial of the charges of grand larceny and burglary was improper; (d) the defense was undermined when (d1) the state was permitted belatedly to call a rebuttal witness who disputed an assertion made by defendant's alibi witness with respect to his background and (d2) the trial court did not grant a continuance to the defendant to recall the alibi witness and (d3) law enforcement officers interfered with defendant's alibi witness improperly and prejudicially by interrogating him vigorously near the courtroom when his testimony was completed; and (e) the sheriff of Rice County sat at the counsel table with the prosecution.

■ Defendant's claim that the evidence does not support the verdict and that the testimony of the state's witness, Zaspel, was not adequately corroborated calls for detailed examination of the record.

### ZASPEL'S TESTIMONY

At the time of the trial in January 1960, Ziegfried Zaspel was and for about 4 years had been a resident of the city of St. Paul employed at the Griggs-Midway Building on University Avenue in that city as a carpenter foreman. He acknowledged five felony convictions including one for burglary, entered upon his plea of guilty, based on his participation in the March 14, 1959, escapade.

Zaspel had been acquainted with the defendant, John Biehoffer, and his brother, Jay, for some time before March 13, 1959. Jay had space in the Griggs-Midway Building where he was developing an iceboring machine. At times he helped as a painter there. On occasion, defendant would come to the building to see his brother. Jay Biehoffer was also interested in and was sometimes to be found at a boatworks located on Central Avenue in northeast Minneapolis.

On March 13, Zaspel, John Biehoffer, Jay Biehoffer, James Davidson, a brother-in-law of Jay, and others ate together in the lunchroom at the Griggs-Midway Building. And, in response to a late evening telephone call from Jay, Zaspel, then at his home, met the brothers at a West St. Paul hamburger shop at about 11 p. m. that night. They talked about "a job at Northfield in the Eagles Club." According to Zaspel, John Biehoffer said "he was down there that afternoon looking the place over." It was agreed that all three would go to Northfield that night. Because defendant's car was low on gas and without a spare tire, they decided to use Zaspel's station wagon for the trip. "They transferred some tools and clothes and metal box containing guns into my car." These included "a sledge hammer, crowbar, screwdriver and a bar they call a gooseneck bar and a hatchet or ax." The three men then drove to Northfield with Jay in the back seat and John in the front.

At Northfield they drove to the vicinity of the Eagles Club which is located just westerly of the bridge spanning the Cannon River on Highway 218 and stopped at a Sinclair oil station situated across

the street and southerly of it. The attendant filled the car with gas. John Biehoffer did not leave the car while they were at the station, but the other two did momentarily. Having observed that the Eagles Club was apparently closed, the three then drove away in the car, parking it in a residential area about three blocks westerly of the river and the club. Jay Biehoffer and the defendant "put on old jackets and clothing and Jay distributed the tools and the guns." Defendant was then carrying a gun with a "bright nickel handle or barrel and sort of a yellowish bone colored handle or plastic handle." Zaspel was given a 32 automatic. He had seen these guns on previous occasions, once on a fishing trip he had taken with John and Jay to Rainy Lake and again at the boatworks in Minneapolis in which Jay had an interest. In addition, Zaspel was given a sledge hammer and an ax. All three of them were wearing gloves. Then they walked to the Eagles Club, approaching it from the rear or west end of the building. John Biehoffer crawled up to a second-story window; opened it; and climbed in, signalling Zaspel to follow. He did so. Then John went down the stairs and let Jay in through a rear door. They looted the till and were about to direct their attention to a safe found there when "we noticed a car." Jay "hollered that the law was outside," and, opening a window on the south side of the building, jumped to the ground. He fled in the direction of the Northfield Malt-O-Meal plant which is located across the street and to the south of the Eagles Club. Zaspel said that as soon as he saw Jay Biehoffer run, he jumped out after him. As he did so, the police, then stationed at the back or west end of the building, came around to the south side of it. Zaspel started to run across the Cannon River bridge, the police in hot pursuit. They were shooting and Zaspel took the gun he had and held it up in the air and shot and ran down an alley. He ran to the river where, discarding his gun, he was able to wade across and reach his car. He discovered that the clothing which Jay and John had left in the automobile was gone except for John's work jacket.

Arriving in St. Paul at about 5 o'clock in the morning, Zaspel called the boatworks and Jay Biehoffer answered. Zaspel told Jay that he had lost his glasses at Northfield by the Eagles Club and plans

were made to recover this incriminating evidence if possible. At about 8 a. m. he went from his home to his place of work and then to the Midway Hospital where a cast was applied to relieve a foot injury aggravated by the flight. At about 2 p. m. Zaspel went to the boatworks. Both defendant and Jay were there. The three went for a ride in Zaspel's car. John explained that he had gone down to Northfield earlier in the day, but that he was unable to find the glasses. They related that they had stolen a car in Northfield and driven back to St. Paul the night before. Then they returned to the boatworks; the brothers got out of the car; Zaspel did not see John again during this period. Zaspel was in contact with Jay before they were apprehended and again after they were released on bond.

Zaspel identified the gray work jacket which, according to his testimony, had been left in his car on the night of March 13 by defendant and it was received in evidence. This jacket had remained in his car for about a week following the burglary and then was removed by an agent from the crime bureau. A tire tool, a crowbar, a gooseneck, and a screwdriver used in the burglary were also identified and received in evidence. He identified the gun of which defendant was in possession when the crime was committed, and (by virtue of the testimony of other witnesses) it was established that it had been discovered near the scene of the crime after its occurrence. The sledge hammer and ax were identified and received. Gloves (located, as other evidence showed, near the crime scene following its occurrence) were identified as being the type used by the participants and accepted in evidence.

Upon cross-examination, defendant's attorney established that Zaspel was first convicted of a felony in 1941 in St. Paul; that he was convicted of a felony again in 1943 in the same city; that later he was convicted of burglary in Minneapolis; that he was charged and found guilty of breaking and entering in Eau Claire, Wisconsin; and that he had pleaded guilty to third-degree burglary in connection with the Northfield incident upon advice of counsel.

Although Zaspel was subjected to rigorous and perceptive cross-examination, the residual impression obtained from reading his testimony

is persuasive in support of the position of the state, being essentially consistent and nonevasive.

### The Corroboration

█ *Admissions*: James Brown called as a witness by the state testified that in August 1959 he was an inmate of the Rice County jail at Faribault, Minnesota, where he was confined on a charge of petty theft. His background included prior felony convictions. His former wife was married to Jay Biehoffer. He engaged in a conversation with defendant while cutting his hair at the jail and defendant stated that he and his brother and another had been "picked up" for breaking into the Eagles Club; that his brother had already been sentenced to the State Prison at Stillwater; and that he was waiting trial for his part in it. These questions and answers then appear:

"Q. Did he say anything to you as to whether he had or had not participated in that?

"A. He said he had.

"Q. Did he make any reference to what was accomplished there?

"A. I asked him what they got and he said all we got was $90.00."

█ *Flight to Avoid Arrest*: Gerald J. Woody, subpoenaed as a witness by the state, was an employee at the Minneapolis boatworks on or about March 21, 1959, when he received a telephone call from defendant who asked for his brother. Gerald explained that "the authorities had taken Jay." Although defendant was known to be a resident of Forest Lake, Minnesota, search and inquiry for him there and elsewhere from that time until July 13 was unavailing. James Crawford, a highway patrolman, who knew defendant to have been a resident in Forest Lake, looked for him during this interval because a warrant had been issued for his arrest. On July 13 he found him sleeping in his Plymouth station wagon on an isolated road near Wyoming, Minnesota. The 1958 license plates attached to the vehicle belonged properly on a panel truck owned by John in 1958, but the 1959 tabs then being used did not belong to him. The license plates which belonged on the station wagon and which, ordinarily, would be of aid to

anyone seeking to apprehend him were found later underneath the rubber matting in the rear of the car.

Michael McGinnis of the State Bureau of Criminal Apprehension testified that he had assisted in the effort to locate defendant from March 19, 1959, until he was apprehended on July 13, and that he and his associate, Charles Reiter, took the defendant from the sheriff's office at Stillwater to the office of the bureau of criminal apprehension on that day. En route to St. Paul, defendant said, "I am glad this is over, * * * sleeping in the car and the eating here and there and hungry most of the time." Also, the defendant asked if somebody had made a statement to the effect that they had burglarized the Eagles Club in Northfield. Receiving an affirmative reply, he asked, "Who?" to which McGinnis replied, "Ziggie." Mr. Roy T. Noonan, superintendent of the State Bureau of Criminal Apprehension, testified that on July 13, 1959, the defendant was interviewed at the office by agents Reiter and McGinnis at which time he said that "this ducking out is for the birds" and "he was glad it was over with." Reiter gave a similar report as to conversations which, if believed, support the inference that defendant, upon hearing of his brother's arrest, feared and sought to avoid apprehension.

■ *Association with Participants*: Under ordinary circumstances evidence introduced to show association between defendant and his brother on the day before the crime took place would be of no particular significance because of their relationship. There are circumstances in this case, however, which make the testimony with respect to their being together on that day out of the ordinary. Jay Biehoffer, called as a witness for the defense, testified that he did not see his brother on March 13 and had not seen him for a week before that date. As previously noted, Zaspel testified that he had lunch on March 13 with Jay Biehoffer, the defendant, and others, including James E. Davidson. Called as a witness for the state, Davidson testified that the Griggs-Midway Building is owned by his father and others and that on or about March 13, 1959, he had eaten lunch in the lunchroom of the building with Jay Biehoffer, Zaspel, and the defendant. The defendant himself did not take the witness stand and no unfavor-

able inference is to be drawn from that circumstance, but the report of Zaspel about this meeting, being buttressed by an apparently disinterested witness, gives a measure of corroboration to the testimony of the accomplice.

*Physical Objects*: While it was not established definitely that the jacket found in Zaspel's car by representatives of the bureau of criminal apprehension belonged to the defendant, it was the only object found there which the state's principal witness disclaimed. The gun which Zaspel claimed was in the possession of defendant at the time of the burglary, and which he had observed in his possession on prior occasions, was introduced in evidence. The tools which were discovered in the Eagles Club following the break-in conformed to Zaspel's description of the instruments taken from defendant's car and placed in his before the theft. The gloves found in the vicinity of the Eagles Club were of the same kind used by the participants. Even so, without the testimony of the accomplice, these physical objects were not tied to the defendant.

*Proximity to Scene of Crime*: Wesley Raadt was employed at the Sinclair oil station at Northfield on the night of March 13, 1959. He recalled that Zaspel, Jay Biehoffer, and a third man, whose appearance he did not note specifically, drove into the station and ordered gasoline at about midnight. His identification was not based on any prior acquaintance because they were strangers to him. There is no evidence that defendant was seen at or near the scene of the crime after its occurrence. The police officers, as noted, saw only two men leave the building and of the two the only one close enough to be identified was Zaspel. Evidence to the effect that a car was stolen the night of the burglary in the city of Northfield and later found abandoned in St. Paul is consistent with Zaspel's testimony attributing to the Biehoffer brothers a statement to the effect that they had stolen a car at Northfield to effect escape.

We believe that the corroborative evidence outlined is adequate to meet the test set out by the recent decisions of this court. See, State v. Mathiasen, 267 Minn. 393, 127 N. W. (2d) 534; State v. Lupino, 268 Minn. 344, 129 N. W. (2d) 294.

There is also evidence which runs contrary to an inference of guilt. Emma Cornell, who lived in a building immediately adjoining the Eagles Club and who called the police when she saw men entering the second-story window of the building from the rear, observed only two persons, neither of whom she was able to identify positively. But the fact that she saw only two men does not rule out the presence of a third, particularly when we note Zaspel's testimony that only he and defendant entered the Eagles hall through the window while Jay entered the building through a first-floor door opened from the inside by his brother. The police officers who came to the scene in response to Mrs. Cornell's telephone report saw only two men leave the building, but the jury could have concluded that three men were actually in it as Zaspel claimed; that Jay Biehoffer, leaving first, was able to escape apprehension because of the commotion which occurred in the attempt to apprehend Zaspel; and that defendant was able to escape without being observed in the attendant confusion. The fact that Wesley Raadt, the filling station attendant, was able to identify both Zaspel and Jay Biehoffer as being present in the automobile which he serviced with gasoline shortly before the burglary, but was unable to identify defendant, is understandable in view of the testimony that Zaspel and Jay got out of the car while John remained in it. In this connection, the testimony of Jay Biehoffer, called as a witness by the defense, was in direct conflict with the disinterested testimony of Raadt in that Jay Biehoffer denied specifically that he was in the city of Northfield at or near the time the crime occurred. It is true that the testimony of Joseph Caruso to the effect that defendant was in his bar in St. Paul on the night in question represents an alibi which, if believed, would have made defendant's presence in Northfield at the time of the burglary and theft an impossibility. On the other hand, the jury was not required to accept Caruso's testimony merely because he gave it. And, having called Caruso, who stated that his recollection of defendant's presence in his bar was made acute because he associated the occasion with the presence of members of a bowling team sponsored by the bar operated by Caruso and recalled that members of the bowling team were engaged in raucous conversation with

John Biehoffer during the evening, the defendant did not produce any of the team members as a supporting witness.

It is our conclusion that if the jury believed the testimony of Zaspel then the guilt of the defendant was established beyond reasonable doubt. We have already determined that they were free to accept this testimony, the corroboration being adequate.

Defendant also questions whether the proof establishes that property of the value of more than $25 was actually stolen. This is an essential element of first-degree grand larceny. In this connection Richard Rice who was in charge of the Eagles Club on the night in question testified that $90 was missing, a figure at which he arrived by adding to the change on hand in the early part of the evening the receipts as recorded in the usual course of business and deducting from the total the amounts paid out. While this type of evidence is not entirely satisfactory, it is sufficient when coupled with defendant's admission, as reported by the witness Brown, that the amount taken was $90.

■ We now consider the claims of defendant to the effect that he was denied a fair trial in violation of his constitutional rights.

■ During direct examination by the county attorney of Ziegfried Zaspel, the following questions and answers were elicited: .

"Q. How long have you known either of them? Take one at a time, if you will.

"A. John I knew, I met, rather, in prison in 1943 or 1944.

"Q. Where was that in prison?

"A. Stillwater prison.

"MR. GRUNDHOEFER: *I object to the answers as not being responsive.*

"THE COURT: Overruled. The answer may stand.

"Q. That was in what year?

"A. In 1943 or 1944." (Italics supplied.)

Upon cross-examination by defendant's attorney, this question and answer appear:

"Q. You claim that you first met John Biehoffer, that is your story

today, is that you first met John Biehoffer in about 1943 or 1944, is that right?

"A. Yes, that is right."

Reference was made then to a prior and seemingly inconsistent statement with respect to which the witness was carefully cross-examined. Upon redirect examination, the following questions and answers appear:

"Q. You stated you first met the defendant in 1943 at Stillwater, is that right?

"A. Yes.

"Q. Between that time and approximately two or three years ago had you seen him at all?

"A. No, sir.

"Q. Is it correct to assume when you said you knew him two or three years you are referring to the time when you knew him best?

"A. That is right."

The fact that defendant had previously been imprisoned in Stillwater was wholly irrelevant to the question of his guilt or innocence of the crime here involved. The authorities are reviewed in State v. Currie, 267 Minn. 294, 126 N. W. (2d) 389, where a new trial was granted because of the prejudice created in that case by questions which embodied a testimonial assertion that defendant had been previously arrested. It seems unnecessary to add anything to what was said in that opinion in order to make it clear that foresight and care must be expended to avoid this type of situation. The defendant is entitled to have the case against him fairly presented in accordance with the established rules. The public should not be burdened with the expense of retrials made necessary because of impropriety. In this particular case, we do not believe that reversible error has been made to appear. Zaspel's statement that he had met John "in prison in 1943 or 1944" was not responsive to the question asked by the prosecuting attorney. Whatever harm was done occurred at that point and, at that time, there was neither objection nor motion to strike. The following question: "Where was that in prison?" should not have

46

been asked, but the answer, "Stillwater prison," was surely responsive to the question and objection was made at that point on that ground alone. Even so, a new trial might be justified because of the proceedings in this regard were it not for other circumstances in the case. The testimony of Zaspel that he had been on friendly terms with both Jay and John Biehoffer for some time prior to March 13, 1959, was not disputed by the brother, Jay, although he was called as a witness by the defendant and would have surely been in a position to deny the assertion if it was contested. A fairly close association between the two brothers is evident from all of the testimony. The fact that Zaspel had a felony record dating back to 1941 was developed both on direct and cross-examination as noted above, and the defendant himself developed the background of Jay as a felon when he was presented as a witness. It was stated and repeated in the record that the second felony conviction of Zaspel occurred in 1943 and, with this background, a statement by the witness Zaspel that he had first met defendant in that year would, without any amplification, carry with it an unfavorable inference.

 When the state called Charles Reiter, a crime investigator for the State Bureau of Criminal Apprehension, he testified as follows:

"Q. * * * When approximately was it first known by you that the defendant was wanted for an alleged break-in at the Eagles Club in Northfield?

"A. Well, he was suspected immediately on March 14th when Mr.—when the sheriff notified our office and came up to the office and talked to me about it."

No attempt was made to show the basis for the suspicion, if there was a basis. The answer was not responsive to the question and the matter was not pursued. Experienced police officers should not make statements of this kind because in doing so they unnecessarily raise serious questions as to the fairness of the trial proceedings. In this case, reversible error is not made to appear, but in a different situation such a nonresponsive remark might have made a new trial necessary.

■ Defendant was charged with grand larceny in the first degree in violation of Minn. St. 1961, § 622.05, and burglary in the third degree in violation of § 621.10. These are two separate and distinct crimes and the commission of one is not necessarily included in the commission of another. See, State v. Hackett, 47 Minn. 425, 50 N. W. 472. The defendant's attorney moved that the two offenses be separated for trial and that defendant first be tried on the charge of grand larceny in the first degree. Minn. St. 1961, § 621.12, then in force, provided:

"Every person who, having entered a building under such circumstances as to constitute burglary in any degree, shall commit any crime therein, shall be punished therefor as well as for burglary, and may be prosecuted for each crime separately."

Defendant contends that the word "may" as it appears in the statute should be construed to mean "must" and to give the absolute right to separate trials. State v. Martineau, 257 Minn. 334, 101 N. W. (2d) 410, relied upon by defendant, does not support this claim. That decision holds merely that separate trials should be ordered when, to do otherwise, will be to cause a situation which by its nature will operate to the defendant's prejudice. We do not find that any evidence was introduced in this case of a prejudicial nature which would not have been admissible if the cases were tried separately. Our disposition of this contention is in accord with the weight of authority. 23 C. J. S., Criminal Law, § 931; Minn. Digest, Criminal Law, Key No. 620(1); Annotation, 59 A. L. R. (2d) 841.

■ We now consider the claims of the defendant involving his alibi defense.

The defense rested at 3:30 p. m. in the afternoon the day before the trial ended, and after a conference at the bench, the court announced a recess until 9:30 the following morning. In the morning the state announced that it had one rebuttal witness, namely, Salvatore Maniaci. The attorney representing the defendant at the trial objected on the ground that the defense had rested the day before. He argued that the state should have announced to the court and to the defense attorney that it would require a continuance until the following morn-

ing for the purpose of calling a rebuttal witness. In the meantime, the defense had released Caruso. Complaint is made that the court did not grant the defendant a continuance for the purpose of making arrangements to call the witness, Joseph Caruso, to rebut the state's rebuttal witness, Salvatore Maniaci.

The following statement by defense counsel appears in the record:

"* * * May the record show that yesterday afternoon the defense rested at approximately three-thirty in the afternoon with the testimony of Joseph Caruso, that at that time the state should have presented any rebuttal testimony that may be introduced in this matter. Mr. Caruso yesterday was under doctor's orders, had been transported to Faribault for trial from St. Paul, that it is anticipated that the testimony of this witness will rebut the testimony or attempt to rebut the testimony of Mr. Caruso. The state, we feel, was under obligation to produce its witnesses yesterday afternoon when Mr. Caruso was present. I have been informed by Mr. Caruso's doctor that he cannot be present for testimony this afternoon or this morning. Therefore, the defense has no opportunity to rebut the testimony—the anticipated testimony of this witness. The prosecution, we contend, was aware that Mr. Caruso would testify and had ample opportunity and investigative forces at its disposal to have available for rebuttal any witnesses that may be necessary to rebut Mr. Caruso's testimony. The defense is greatly prejudiced at this time by any introduction of evidence by the present witness because we are unable to produce Mr. Caruso.

* * * * *

"* * * Yesterday afternoon at the conclusion of Mr. Caruso's testimony he was requested by me to wait either in the courtroom or downstairs in the coffee shop, that during the time that I and the county attorney were in the judge's chambers discussing the proposed charge to the jury Mr. Caruso was brought into the law library for intensive questioning by Mr. Reiter and Mr. McGinnis, Sheriff Carver, that after I left the judge's chambers I spent approximately 20 minutes looking around the courthouse building, I went outside * * * circled the courthouse looking for Mr. Caruso. I finally came back to the

judge's chambers and went into the law library and in the law library the aforementioned persons were with Mr. Caruso along with the county attorney. At the time all of the persons were talking in loud voices in heated argumentative discussion * * *. Mr. Caruso appeared to be in a state of great excitement and anxiety which undoubtedly caused the fact that he cannot be present in court today.

"MR. COOK: The state has nothing to offer except any information given by the witness was voluntary insofar as my office has any knowledge of the matter."

Action on the part of representatives of the state which might be construed as intimidation of witnesses must be scrupulously avoided. But we do not see where the defendant was prejudiced either by the interrogation of Mr. Caruso by the law enforcement officers or his inability to keep Mr. Caruso at the trial for further testimony. The only part of Caruso's testimony which Maniaci contradicted was that in which Caruso said that he had at one time worked as a probation officer in the city of St. Paul. In this regard, Maniaci testified that he himself had worked for the department of probation and parole during the period to which Caruso had made reference and that he had never heard of him. He said also, without objection, that the records of the department failed to show Caruso's employment there. This conflict could not possibly have been resolved by recalling Caruso to repeat the testimony which he had previously given, and he was not in a position to testify as to Maniaci's knowledge or lack of it. The solution, if there was one, would have been to call the custodian of the personnel records of the department or its head and settle the matter one way or the other, but no attempt was made to do this. We have no way of knowing what such evidence might have been had defendant been able to produce it. Prejudicial abuse of discretion, therefore, is not made to appear.

■ As noted in State v. Schwartz, 266 Minn. 104, 122 N. W. (2d) 769, it is inappropriate for the county sheriff who investigated the case to be present at the prosecuting counsel's table during the trial.

We have considered the claims of the defendant with respect to trial defects separately. An accumulation of encroachments upon the

rights of the defendant, each insufficient of itself to taint the trial, can in combination destroy the atmosphere of fairness needed if respect for law is to be preserved. We have read the entire record in light of this principle, and, having done so, we are satisfied that the verdict of the jury is consistent with the evidence and that justice does not require a second trial of the charges here involved.

Affirmed.