STATE v. FRED MAURICE BONNER II.

146 N. W. (2d) 770.

November 18, 1966—No. 39,640.

*Wheeler & Fredrikson* and *Jerome B. Pederson,* for appellant.

*Robert W. Mattson,* Attorney General, *George M. Scott,* County Attorney, and *Theodore R. Rix,* Assistant County Attorney, for respondent.

THOMAS GALLAGHER, JUSTICE.

On April 28, 1964, following a trial, defendant was convicted of the crime of aggravated assault (Minn. St. 609.225, subd. 1) and on May 11, 1964, was sentenced to the custody of the commissioner of corrections. The indictment charged defendant as follows:

"FRED MAURICE BONNER II is accused by the Grand Jury of the County of Hennepin, in the State of Minnesota, by this indictment, of the crime of AGGRAVATED ASSAULT (Laws of 1963, Chapter 753, Article 1, Sec. 609.225, subd. (1)) committed as follows:

"The said Fred Maurice Bonner II on or about the 23rd day of December * * * 1963, at the City of Minneapolis in said Hennepin County, Minnesota, then and there being, did wilfully, wrongfully, intentionally and feloniously, inflict great bodily harm upon another person, to-wit: Myrrhene Dorothy Crawford, by then and there throwing at and upon the said Myrrhene Dorothy Crawford about the head, neck, breast, face and body a sulphuric acid solution, thereby inflicting great bodily harm to the said Myrrhene Dorothy Crawford * * *."

On appeal from his conviction defendant contends that (1) a "watch

cap" and a pair of boots which were taken by police officers from his room and which defendant moved to suppress as evidence prior to and during his trial were erroneously received in evidence as exhibits; (2) the court erred in receiving certain photographs of defendant which were obtained in the absence of and without the consent of his counsel and certain other exhibits which were based upon his fingerprints; and (3) the testimony of a police officer that in his interrogation of defendant he had asked him why he had not told his sister what had occurred created the impression that defendant had confessed and thus prejudiced the jury, notwithstanding that the court had sustained defendant's objections to such testimony.

The facts with respect to defendant's arrest and interrogation are as follows: On January 2, 1964, James Keating, a police officer employed by the University of Chicago, and Anthony Eidson, superintendent of security for the University of Chicago, went to defendant's room at International House on the campus of the University of Chicago, accompanied by Mrs. Florence Beavers, director of International House. They knocked upon defendant's door and, in response to his inquiry, Mrs. Beavers advised defendant that two police officers wished to talk to him. After two or three minutes, defendant opened his door and admitted the officers. Officer Keating then advised defendant that the Chicago University campus police had been contacted by Minneapolis police, who requested that they go to International House to ascertain if defendant had worked on December 23, 1963, and whether he bore any marks on his body which might have developed from an acid burn. Defendant then told these officers that friends of his in Minneapolis had told him that his former wife, Myrrhene Crawford, had been the victim of an acid-throwing assault in Minneapolis.

On the motion to suppress evidence consisting of a "watch cap" which was found in defendant's room at that time, Officer Keating testified as follows:

"* * * We told him that—would he mind if we looked through his stuff, we were looking for a fur collared jacket and a watch cap. And Mr. Bonner said no, he had no objections, that he was certainly willing to try and do everything he could to clear himself of the incident * * *."

He testified further that in searching defendant's room he found the cap in a dresser and that he then asked defendant:

"Would you have any objection if we sent this to the Crime Laboratory in Minneapolis,"

to which defendant had replied:

"No, * * * I'll do anything to clear this up."

On the motion to suppress this evidence, defendant testified that he had not granted anyone permission to search his room.

Later, on January 6, 1964, Detective Robert W. Finn of the Minneapolis Police Department went to Chicago with a warrant for the arrest of defendant for the crime of aggravated assault committed upon Myrrhene Crawford. On that day Detective Finn met defendant and Officer Keating in the office at International House. At that time defendant was not under arrest and the warrant had not been served upon him. Detective Finn testified that he then told defendant he wished to ask him some questions and asked defendant if he preferred to go to his room for this purpose to save him embarrassment; that in defendant's room he then told defendant that he was there in regard to the assault case in which acid had been thrown on defendant's ex-wife in Minneapolis on December 23, 1963; that he then served defendant with a warrant for his arrest and advised him that he was under arrest; that he then had advised defendant that there was conclusive evidence that defendant had committed the crime, but that defendant denied knowing anything about it; that he then had advised defendant that anything defendant said to him he (Finn) might be required to testify to; that he then had asked defendant if he had any objection if his room was searched and that defendant then gave him permission to do so; and that, following this, he had searched defendant's closet, where he found a pair of boots, with tread prints like those found on the garage floor near the house where the crime had been committed. When defendant said the boots belonged to him, Detective Finn took them with him to be used as evidence at the trial. On defendant's motion to suppress this evidence, he testified that at no time had he consented that his room be searched.

Detective Finn further testified that after defendant's arrest he had had several conversations with him. During his testimony on this, the following occurred:

"Q [By Mr. Snell, counsel for the state] When had you had a previous conversation with him about his sister?

"A On the evening of January 6th at the Area 1 Homicide office [in Chicago].

"Q Will you relate that conversation, please?

"A I had just talked to his sister on the telephone and I asked the defendant if he would please tell his sister and his mother when they came back to see him that evening actually what had occurred in Minneapolis, as they were blaming me for taking an innocent man back to Minneapolis. I said, 'They will not testify against you and it wouldn't make no difference in your case.'

"MR. HARTIGAN [counsel for defendant]: Your Honor, again I am going to object. He is interposing a conclusion.

"THE COURT: Objection sustained and the answer may be stricken.

\* \* \* \* \*

"THE COURT: Let me say this: This is not cricket. His last statement inferred that he thought that this man was guilty.

\* \* \* \* \*

"MR. GOULETT [counsel for the state]: Your Honor, we are offering it as indicating consciousness of guilt.

"THE COURT: Well, it certainly isn't coming out right. I hold no brief for this man, but it offends my sense of justice. I think you better back up a little bit.

\* \* \* \* \*

"Q Did you have a conversation with him about whether or not he had talked to his sister the previous evening?

"A Yes, sir, I did. I said, 'I requested last night——.'

"Q Without repeating what you had said last night, did you ask him about whether or not he had done that?

"A I asked him if he had told—why he hadn't told his sister about what had occurred——."

He testified further that at the time of defendant's arrest he noticed a trauma on defendant's left eye and cheek just below the eye and that defendant's eye socket was bleeding occasionally. Subsequent to defendant's arraignment and after counsel had been appointed for him, photographs of this area of defendant's face were taken. These were received in evidence over defendant's objection.

Wilkaan Fong, laboratory director for the Minnesota Bureau of Criminal Apprehension, testified that he had visited the garage at the rear of the Crawford house for the purpose of examining certain shoe prints found on the garage floor; that he had made photographs of them and compared them with prints made by the boots taken from defendant's room and that he was of the opinion that the boots could have made the imprints found on the garage floor.

Ronald Welbaum, superintendent of the Bureau of Identification of the Minneapolis Police Department, testified that on January 2, 1964, he had examined a jar containing sulphuric acid found in the garage and found a fingerprint thereon, which in his opinion was the same as a fingerprint on a chart containing defendant's fingerprints. This chart was received in evidence over defendant's objections.

On April 22, 1964, defendant moved for suppression of the boots. This motion was denied. On April 24 he moved to suppress the cap taken from his room as above described. This motion was also denied.

Defendant testified in support of these motions. On cross-examination he admitted that before the officers entered his room at International House he had been warned that he was implicated in and was suspected of the crime described and that he should obtain an attorney before he proceeded further. He testified that he then told the officers that he was willing to cooperate with them if his counsel should advise him to do so; and that at that time he requested the assistance of counsel. He also testified that at no time had he granted these officers permission to search his room.

With respect to the boots which were taken from his room defendant testified that just before this Officer Keating had stopped him near the entrance to International House; that neither Detective Finn nor Officer Keating then advised him that they had a warrant for his arrest; that they merely asked if they could go to his room to talk to him and that when

they got to his room the warrant was served upon him; and that he considered that he had been under arrest when he first met these officers in the corridor or lobby of International House.

■ We find no error in the court's admission of the "watch cap" found in defendant's room when it was first searched by Police Officers Keating and Eidson on January 2, 1964. While it is clear that this search was prior to defendant's arrest and without a search warrant, the evidence discovered therein would be admissible if the state established that the search was made with defendant's consent. Villano v. United States (10 Cir.) 310 F. (2d) 680; United States v. Page (9 Cir.) 302 F. (2d) 81.

On defendant's motion to suppress this evidence, conflicting testimony was submitted (outside the presence of the jury) as to whether defendant had given his consent to the search. As indicated above, Officer Keating's testimony was that before the search he and Officer Eidson advised defendant that they had come to his room to check on his whereabouts on the date of the assault upon his former wife; that they asked him if they could search his room; and that defendant had then told them he was aware of the assault and voiced no objection to the search of his room because, as he said, "he was certainly willing to try and do everything he could to clear himself of the incident." At this hearing defendant testified that he had not granted anyone permission to search his room on the occasion described and that the police officers had done so without consulting him in any respect whatever.

After hearing all of this testimony the court denied the motion to suppress the evidence. It seems clear that in so doing it found in substance that the state had established by a fair preponderance of the evidence that defendant had consented to the search. Based upon such a finding, there was no error in the reception of the "watch cap" in evidence.

■ As to the boots which were found in defendant's room on the occasion of his arrest on January 6, 1964, and which were received to establish that they would leave imprints similar to those found in the garage at the rear of the Crawford house, it seems clear that there was evidence on the motion sufficient to support a finding that the search which disclosed the boots was made after the warrant for defendant's

arrest had been served. The rule appears established that evidence obtained as a result of a search in the course of an arrest is admissible even though the defendant did not consent to the search. State v. Demry, 260 Minn. 173, 109 N. W. (2d) 587; see, Lustig v. United States, 338 U. S. 74, 69 S. Ct. 1372, 93 L. ed. 1819. Based thereon, we hold that the boots were admissible in evidence even though defendant had not consented to the search which led to their discovery.

■ Defendant contends certain photographs of defendant taken shortly after his arrest and in the absence of his counsel should not have been received; and that the court erred in admitting fingerprints and a comparative fingerprint chart of defendant's fingers prepared by Mr. Fong which identified defendant as the person handling the jar containing sulphuric acid found in the garage at the rear of the Crawford house. Under State v. Emerson, 266 Minn. 217, 123 N. W. (2d) 382, there was no error in the reception of this evidence.

■ In his testimony Detective Finn related how defendant had asked him to speak to defendant's sister to learn if she thought it was the right thing for defendant to return voluntarily to Minneapolis. In response to questions by counsel for the state, Detective Finn then testified that he had advised defendant to tell his sister and mother "actually what had occurred in Minneapolis, as they were blaming me for taking an innocent man back to Minneapolis." The court sustained defendant's immediate objection and ordered the answer stricken. The witness then testified that he later asked defendant "why he hadn't told his sister about what had occurred." Defendant's objection to this was also sustained. The court later instructed the jury to disregard evidence which had not been received or had subsequently been stricken. It is defendant's present contention that notwithstanding this the testimony had the effect of conveying to the jury the inference that Detective Finn believed defendant guilty and accordingly prejudiced the jury.

We have held that voluntary statements of a state's witness before a jury which expressed the witness' opinion as to defendant's guilt or his moral character were prejudicial to the extent of denying the accused a fair trial even though the testimony was later stricken and the jury instructed to disregard it. State v. Huffstutler, 269 Minn. 153, 130 N. W.

(2d) 347; State v. Biehoffer, 269 Minn. 35, 129 N. W. (2d) 918; State v. Boerner, 267 Minn. 539, 127 N. W. (2d) 555. In State v. Biehoffer, *supra,* a comment by a police officer that defendant was "an immediate suspect" of the crime involved was considered improper but not sufficient to constitute a ground for a new trial. In State v. Huffstutler, *supra,* where a new trial was ordered, the witness volunteered improper statements with respect to the moral character of the defendant which must have had the effect of prejudicing the jury against him. In State v. Boerner, *supra,* the testimony of a witness that privileged medical reports disclosed that defendant, accused of sexual contact with a child, had suffered from a venereal disease some time before was regarded as prejudicial to the extent of denying him a fair trial. In the Huffstutler and Boerner cases, the improper testimony was held certain to have prejudiced the jury against the accused.

Here, we do not feel that the testimony of Detective Finn, as above described, was prejudicial to the extent of constituting the denial of a fair trial for defendant. He made clear the fact that at no time did he obtain a confession from defendant. His suggestion that defendant tell his sister what had occurred did not necessarily convey the impression that defendant should admit his guilt to his sister. If defendant insisted he was not guilty, there was no requirement that he tell his sister otherwise. Certainly if he were innocent, he could so inform his sister and then seek her advice as to whether he should voluntarily return to Minneapolis to meet the charges against him. Detective Finn's testimony with reference to extradition was that he had told defendant that, whatever his defense was, it would be better to return voluntarily to defend himself and that after seeing defendant's sister he had told defendant that she was of the same opinion. When all this testimony is considered, it seems clear that there was nothing therein which would lead to the conclusion that defendant had acquiesced in Detective Finn's belief as to his guilt.

We hold that the voluntary statements made by Detective Finn as above described, to which objection was sustained and which the jury was instructed to disregard, were not prejudicial to the extent of requiring a new trial.

Affirmed.