# STATE v. ROCKY LUPINO.*

129 N. W. (2d) 294.

June 12, 1964—No. 38,260.

*Certified to U. S. Supreme Court October 14, 1964.

*John S. Connolly,* for appellant.

*Walter F. Mondale,* Attorney General, *Charles E. Houston,* Solicitor General, and *William B. Randall,* County Attorney, for respondent.

SHERAN, JUSTICE.

Appeal from a judgment of conviction in criminal proceedings.

On December 8, 1959, defendant was indicted for a kidnaping

which allegedly occurred September 28, 1953. Trial commenced on March 10, 1960. The case was submitted to a jury on April 5. Defendant was found guilty. Four years have elapsed and we are now urged to grant a new trial or direct the acquittal of defendant because (1) the prosecution was barred by the applicable statute of limitations; (2) the evidence fails to sustain the verdict of guilty, there being insufficient corroborating evidence; and (3) defendant's State and Federal constitutional rights were violated in connection with the proceedings which resulted in his conviction in that (a) public opinion in the forum had been contaminated by unfair publicity, (b) defendant was denied compulsory process for obtaining witnesses in his favor, (c) the trial court refused to permit defendant to examine prior statements of prosecution witnesses for the purpose of conducting his cross-examination, (d) the fact that defendant allegedly was involved in other crimes was called to the attention of the jury both by statements of the prosecuting attorney and by the interrogation of witnesses, (e) a juror sworn as such was excused at the insistence of the state prior to the commencement of the trial, (f) a written statement made by witness Alex DeGoode was improperly received in evidence, and (g) the state was improperly permitted to cross-examine its own witnesses.

■ The indictment was returned December 8, 1959, over 6 years after the alleged offense. Minn. St. 628.26 provides:

"Indictments for murder may be found at any time after the death of the person killed; in all other cases, indictments shall be found and filed in the proper court within three years after the commission of the offense; but the time during which the defendant shall not be an inhabitant of, or usually resident within, this state, shall not constitute any part of the limitation of three years."

Criminal prosecution in this instance is barred by the statute unless the established fact that defendant left the State of Minnesota on September 29, 1953, to go to South Carolina and stayed there until the spring of 1958 served to toll it. Defendant argues that the statute was not tolled because "the whole time he was away from September 29, 1953, until the time of trial, when he was absent from the state he

was absent because he was imprisoned." In Kubus v. Swenson, 242 Minn. 425, 426, 65 N. W. (2d) 177, 178, certiorari denied, 348 U. S. 877, 75 S. Ct. 114, 99 L. ed. 690, this court said:

"The tolling provision of § 628.26 is clear and unambiguous in providing that the statute shall not run during the absence of the defendant from the state."

In State v. Pederson, 251 Minn. 372, 88 N. W. (2d) 13, it was held that the statute of limitations with reference to prosecution for criminal offenses is suspended during the time the defendant is a fugitive from justice and absent from the state. The Pederson case is distinguishable because there the defendant had escaped from jail while awaiting arraignment on a charge of forgery. Nevertheless, the decisions cited and the language used in our statute lead us to the conclusion that a person who leaves the state and goes to another jurisdiction is not "an inhabitant of, or usually resident within, this state" within the meaning of these words as used in § 628.26 during the period of his absence, even though confinement in jail prevents his return.[1]

■ The principal witness for the prosecution was Alex DeGoode, an admitted accomplice. A brief review of his testimony is required in order to determine whether it was corroborated as required by § 634.04.[2]

## DeGoode's Testimony

In May 1953 DeGoode was living at Myrtle Beach, South Carolina. John Azzone and the defendant, Lupino, whom DeGoode had known for a number of years, met with him to discuss a contemplated crime. They then left, returning in early August 1953 with Fred Mussehl and Anthony DeVito. The five of them burglarized a safe at Aynor, South Carolina, located about 30 miles from Myrtle Beach. Shortly

---

[1]Compare 22 C. J. S., Criminal Law, § 232.

[2]Minn. St. 634.04 provides: "A conviction cannot be had upon the testimony of an accomplice, unless it is corroborated by such other evidence as tends to convict the defendant of the commission of the offense, and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

thereafter, all five were arrested and charged with the offense. DeVito and Mussehl gave written statements to the South Carolina police officers in which they admitted the Aynor burglary and asserted that Azzone, DeGoode, and Lupino had participated. All were released on bond. It was agreed between Lupino, Azzone, and DeGoode that DeVito and Mussehl, having given the written statements, would probably testify against them in the anticipated criminal proceedings in South Carolina and that, to prevent this, it would be necessary to kill them.

DeGoode was in the Twin Cities again on or about September 23, 1953, and while here, discussed with Lupino and Azzone the possibility of having Mussehl "set DeVito up" for a killing. But DeVito was wary. On September 25, 1953, DeGoode, Lupino, Azzone, and Sam Cimin kidnaped one John O'Hara, who operated a tavern in Minneapolis, as he was about to enter his home and, taking him back to his bar, forced him to turn over the contents of a safe to them.

On Sunday, September 27, 1953, DeGoode, Lupino, Azzone, and Cimin went to the Italian Village, then run by Joseph Forese, on Kellogg Boulevard in downtown St. Paul. While there, defendant went to the telephone and reported that he was talking to a Tony Legatto. Between midnight and 1 a. m. they left the Italian Village and drove to the vicinity of Jack's Lounge and Cafe on West Seventh Street where it was observed that DeVito and Legatto were in the restaurant. They then parked their car and waited for them to come out. When they did, and as they walked past the car which the four men were using, DeVito was seized. DeGoode put a pistol in his back and Cimin gagged him. Legatto, who had been walking down the street with DeVito, said, "that's it, Rock" and left without interference. Sam Cimin put a sash cord in DeVito's mouth to prevent him from calling for help. They got into the car, Azzone and Cimin holding DeVito in the back seat, Lupino driving, and DeGoode in the front seat on the passenger side.

Ultimately they came to a place east of St. Paul by a deserted house and near a swamp. DeVito was taken out of the car. A box containing two shovels and a carton of lye was also removed. Lupino and

Azzone dug a ditch. DeVito, disrobed, was told to lie down. He did so. Then Cimin, at the end aided by Lupino, tightened a rope around his neck with a twisting stick, thus terminating his life. DeVito's body was placed in the ditch and covered with the lye. The hole was filled and, to discourage dogs, the surface of the new ground was covered with red pepper. The living four then retired, tearing up and casting away DeVito's garments as they returned to the city.

DeGoode left St. Paul immediately, arriving in South Carolina again on Tuesday, September 29, where he received a call from defendant stating that things were "hot" in the Twin Cities and that he was coming to South Carolina. Lupino arrived at the Charleston airport with Azzone on September 30, 1953.

Mussehl came to Columbia, South Carolina, on October 2, 1953. DeGoode, Lupino, and Azzone met him there. He assured them, DeVito now being dead, that he would not testify against them.

In the early morning hours of Saturday, October 3, DeGoode, Lupino, and Azzone burglarized the safe of a beer distributor in Charleston, South Carolina. The three of them were arrested that same day on account of this burglary. It was finally agreed among them that DeGoode, Lupino, and Azzone would plead guilty to the Aynor job. They were sentenced to 5 years. Mussehl also pleaded guilty and was sentenced to a term of 3 years. All four were sent to the South Carolina State Prison at Columbia.

On January 28, 1958, DeGoode, still confined in prison, was interviewed by Lieutenant Ralph Merrill of the St. Paul Police Department. Thereafter, Lupino, also jailed there, contacted DeGoode approximately a dozen times inquiring what he was going to do and what he had told Lieutenant Merrill and pleading that he should not expose defendant. In June 1958, DeGoode, Lupino, and Azzone were indicted for unlawful flight to avoid prosecution for kidnaping and murder by a Federal grand jury in St. Paul, Minnesota. DeGoode pleaded guilty and testified against Lupino and Azzone in the Federal District Court. He was in the custody of the Federal marshal from June 1958 until the time of this trial.

It is evident that the testimony of DeGoode, if believed by the jury,

was sufficient to support its verdict of guilty with respect to Lupino. In State v. Mathiasen, 267 Minn. 393, 127 N. W. (2d) 534, the Minnesota decisions pertaining to the statutory requirements of corroboration were reviewed and it was pointed out that the corroborating evidence, to be sufficient, must affirm the truth of the accomplice's testimony and point to the guilt of the defendant in some substantial degree. Relevant facts corroborative in character include participation in the preparation for the criminal act; opportunity and motive; proximity of the defendant to the place where the crime was committed under unusual circumstances; and association with persons involved in the crime in such a way as to suggest joint participation. We find adequate corroboration in testimony from which the jury could find: (a) DeVito did in fact confess to the Aynor robbery and give a written statement to the South Carolina police implicating Lupino, Azzone, and DeGoode. (b) Lupino did state that DeVito would have to be killed because of his anticipated testimony. (c) DeVito did in fact disappear on September 28, 1953, never to be seen again. (d) On the morning of Monday, September 28, 1953, Lupino was in possession of a 1950 Dodge automobile owned by Anthony Petrangelo, who had been using Lupino's brightly colored car on the weekend of September 26-27. When DeVito was last seen shortly after leaving Heinie's Bar at about 1 a. m. on the morning of September 28, 1953, he was standing beside this same Dodge automobile. (The testimony that Lupino was in possession of this car, separated from DeVito by only 5 hours in time, if accepted by the jury, became even more significant when Lupino denied that he had the car and claimed that he was home in bed when, according to the witness John Potter, he delivered it at 6 a. m. on the morning of the 28th to Potter's service station to be washed.) (e) Lupino boarded an airplane at Rochester, Minnesota, on September 29, 1953, to fly to South Carolina. The jury was free to accept or reject his explanation of having chosen Rochester as a point of departure because he had been referred to a man living there as a possible source of a loan. It seems more probable that the jury concluded, in light of the fact that Legatto was arrested on September 29, that Lupino left from Rochester rather than from the Twin

Cities airport in order to avoid interrogation or apprehension. Other testimony in the record, although less directly corroborative, lends general credence to DeGoode's gruesome recitation. For example, witnesses related a marked change in Lupino's attitude toward DeGoode after it became known that Lieutenant Merrill had interviewed DeGoode in person in the month of January 1958. Again, the similarity between John O'Hara's recitation of the events of the kidnaping of September 25, 1953, as he, the victim, recalled them and the circumstances as related by DeGoode, one of the participants in the crime, makes believable DeGoode's testimony about the occurrence of the incident and his association with Lupino, Azzone, and Cimin at that time.

■ We have concluded that neither the State nor Federal constitutional rights of defendant were violated in connection with the proceedings which resulted in his conviction, and that the interests of justice do not require another trial in this case.

■ A motion for change of venue was made before the trial judge on March 8, 1960—2 days before the trial was scheduled to commence. The motion was based upon the ground that newspaper articles which had been written about the case, and television and radio coverage preceding the trial, prevented a consideration of the criminal charge in an atmosphere of fairness. Particular objection is made to the fact that news broadcasts on television and radio asserted a link between the defendant Lupino and the notorious "Mafia." A man experienced in the field of radio and newspaper work was called as a witness by defendant in support of his motion for a change of venue, but objection to a question which sought to develop his opinion as to whether defendant would have a fair and impartial trial in Ramsey County was sustained and the opinion, whatever it may have been, was not received. In addition, a local television and radio station carried a program based on the theme that the body of DeVito might be located with the aid of a Dutch clairvoyant. After the trial commenced, defendant's counsel requested the court to either change the venue, insulate the jury, or grant a mistrial because of the increased newspaper publicity, radio and television broadcasts, and the like.

It is unnecessary to repeat what has been so recently outlined in

State v. Thompson, 266 Minn. 385, 123 N. W. (2d) 378, where attention was called to those recent decisions of the United States Supreme Court emphasizing that the right of an individual to a fair trial is not to be undermined by the unrestrained exercise of the rights and privileges of press, radio, and television. It is not claimed in this case, however, that the extraordinary publicity given the trial included dissemination of pretrial opinions of responsible public authorities intimating the guilt of the defendant as in the Thompson case. The matter was carefully considered by the trial court, and the claims of the defendant with respect to the possibility of a fair trial were objectively evaluated as indicated by these comments appearing in the transcript:

"The Constitution of our state as well as the United States and the laws of Minnesota guarantee each defendant a fair and impartial trial, and this Court agrees that if a fair trial cannot be had in the County in which the crime has been committed, then it is the duty of the Court to transfer the venue of this action or any action to such county in which a fair trial can be had. However, the Court must be careful in reviewing the evidence to find that there is a reasonable showing that the public has been inflamed or has been wrought up because of the publicity on radio programs or [through] whatever media the dissemination might be [effected], and upon a review of all of this evidence, this Court is of the opinion that no such inflammatory result is apparent. * * * Safeguards are provided by law for challenges and other defenses * * *. The Court is doubtful that any corner of the state could be selected at the present time which would insure less publicity than that already apparent, and the daily coverage of TV, radio, and newspaper, as just stated, covers every corner of the state, and before the trial would get underway in any jurisdiction, such coverage would, perhaps, be as complete as it is in our local area at the present time."

In arriving at this conclusion, the trial court was impressed by a report of "a survey of the citizens of Ramsey and Washington Counties and the suburban area, in which it was found out not one person in 10 who were contacted had a working knowledge of the details of the

main events of this particular crime. Despite the plea of the participants of the program, Behind the Parade, to the public for their participation and cooperation in the assistance of law enforcements, the record discloses that not one in 10 of the persons in the area in which the body is * * * allegedly buried * * * [is informed] as to details leading up to the present time in connection with this crime."

Recognizing as we do the importance of protecting the right of a defendant to be tried in court rather than by public opinion conditioned by publicity media, we conclude that the trial court did not abuse its discretion in denying a change of venue, confinement of the jury, or a mistrial in this case. Refusal to accept opinion testimony on the legal issue was not error.

A petition was filed in behalf of defendant with the trial court for an order requiring that Sheriff John Henry of Conway, South Carolina, and one James Leathers, an inmate of Alcatraz Penitentiary, Alcatraz, California, be made available in St. Paul as witnesses for the defense. In our opinion neither Minn. St. 634.06 nor State and Federal constitutional provisions impose upon the state an obligation to procure witnesses for the defendant who are living outside of the territorial limits of the state, and therefore, beyond the reach of its process. There may be circumstances where the presence of an out-of-state witness whose testimony could be determinative of the innocence of the defendant can be secured with reasonable facility at the time of trial. It is to be assumed that in such an instance arrangements would be made to secure the presence of the vital witness if it is possible to do so. No such showing was made in this case and, therefore, this problem is not before us.

Before beginning cross-examination of the state's principal witness, DeGoode, defendant's attorney stated:

"MR. CONNOLLY: In my cross-examination I would like to make a motion at this time to have available all statements Mr. DeGoode has given to the FBI, the Ramsey County Sheriff's office, the St. Paul Police, and his statement for the purpose of strictly of impeachment.

"THE COURT: Well, I don't know whether I can give you that service or not, Counsel. Those are confidential files of a law enforcement

officer. There has been no evidence of the contents of those statements in evidence except that he gave his statement. Of course, you can resort to your own methods of impeachment, but I don't believe I could force the FBI or the police department [to] let you examine their file for the purpose of possible impeachment.

"Appreciate my position?

"MR. CONNOLLY: Yes, I would like to ask for them though."

In number 3f of this opinion there will be discussion of a statement of the witness, DeGoode, which was received in evidence. Apart from this, we do not find in the record any point at which the attorney for the defendant moved the court for an order directing that a specific person be required to produce a specific statement given by the witness being cross-examined so that such statement could be examined by the trial court to ascertain whether it contained impeaching material. There is nothing in the record before us which makes it possible to determine whether it was within the power of the trial court to compel production of such a statement and, if so, whether the statement, if produced, would contain impeaching data of sufficient significance to make the absence of it prejudicial to the defendant. We conclude, therefore, that error is not made to appear on this ground.

■ During the trial reference was made to the fact that defendant was involved in a burglary in Aynor, South Carolina, in August 1953; that he helped rob a gambler in Minneapolis; and that he participated in the robbery of one John O'Hara in Minneapolis a few days before the alleged kidnaping.

Reference to the robbery in Aynor, South Carolina, was justified because it was DeVito's confession of it involving Lupino, DeGoode, and Azzone which motivated the kidnaping. The testimony with respect to the robbery of John O'Hara occurring on or about September 25, 1953, related by DeGoode and confirmed by O'Hara, was relevant and admissible because the same persons participated in it as those who allegedly participated in the kidnaping of September 28, 1953—i. e., Lupino, DeGoode, Azzone, and Cimin—and because it was done at a time and in a way having evidentiary significance in this case. See, State v. Elli, 267 Minn. 185, 125 N. W. (2d) 738.

Evidence as to the third robbery would not have been admissible ordinarily, but defendant cannot claim prejudice considering the circumstances under which this testimony developed. The record shows that the following occurred as DeGoode was examined:

"Q  Did you have occasion to come to the Twin City area after John and Rock left from Florence?

"A  Yes, he called me that he had a score up here, and I came up on the plane, and we got the guy.

"MR. CONNOLLY: I will ask that the witness only ask the question—

"THE COURT: All right.

"MR. CONNOLLY: Answer the question.

"BY MR. RANDALL:

"Q  Do you recall the time that you came?

"A  No, I can't name the time, no.

"Q  Do you recall how long you stayed?

"A  I just stayed a day or two that time.

\*  \*  \*  \*  \*

"Q  You then left the Twin Cities?

"A  Yes, after, as soon as we robbed the guy, I took right back off.

"MR. CONNOLLY: Ask that the witness be requested to pinpoint when and where this was, who was robbed, and who was present.

"THE COURT: Very well.

"BY MR. RANDALL:

"Q  Will you answer that?

"A  We robbed a gambler over in Minneapolis, I and Sam Cimin and Rock and John, in Minneapolis. It wasn't right down town. It was out in the suburbs of Minneapolis. And when the date was, I can't say."

Considering the manner in which this testimony developed, we do not feel that defendant is now in a position to assert error because of it. Rebuttal of Lupino's assertion made on direct examination that he had never committed any crimes of violence was not prejudicial error compelling reversal.

■  During the course of examination of prospective jurors it came

to the attention of the county attorney that a juror who had already been accepted and sworn was a brother of a man convicted and sentenced to imprisonment in proceedings occurring about a year previously wherein the county attorney represented the state. Concerned about the effect that these circumstances would have upon the juror's capacity to serve impartially, the county attorney requested permission to challenge the juror for actual bias. The matter was submitted to a panel of three triers which, after hearing evidence on the issue of actual bias, found the challenge not to be true. The prosecutor then exercised a peremptory challenge with respect to this juror under § 631.26, which provides in part:

"A challenge to an individual juror is either peremptory, or for cause. It shall be taken when the juror appears, and before he is sworn; but the court, for good cause, may permit it to be taken after he is sworn, and before the jury is completed."

In State v. Ames, 91 Minn. 365, 98 N. W. 190, it was held that the prosecutor could challenge a juror for actual bias, even though the juror had been sworn, upon a showing that newly acquired information disclosed the claimed bias. Defendant contends that where, as here, the triers find no actual bias then the "good cause" required by § 631.26 is not made to appear. In our opinion, the trial court acted within its discretion in this regard and, in any event, prejudice to the defendant by reason of the ruling has not been made apparent.

■ In January 1958 the witness DeGoode gave Lieutenant Ralph Merrill of the St. Paul Police Department a written statement (exhibit BB). It was received in evidence at the trial and defendant claims error in this regard. Lieutenant Merrill was called as a witness for the state and the exhibit, numbering seven pages, was identified as a statement taken from Alex DeGoode at the South Carolina Police Agency Headquarters in Columbia on January 28, 1958. It was offered in evidence, but objection by defendant was sustained. Then, upon cross-examination, the following interrogation by defendant's attorney appears:

"Q   You made the statement to Ralph Merrill in January of 58?

"A  If it's what the date is in there, that's when I made it.

"Q  Do you remember stating in the statement you did not arrive here until the 27th of January, 1958?

"A  There are several things in that statement that's very much in error, Mr. Connolly.

"Q  Quite a few material things?

"A  No, dates and things like that.

\* \* \* \* \*

"Q  Do you remember in the statement you forgot to tell Ralph about that score over in Minneapolis, with O'Hara?

\* \* \* \* \*

"A  Which score are you talking about now? When we clipped that Irishman over there?

"Q  That's right.

"A  He wasn't interested in that. That's Minneapolis. This is St. Paul.

\* \* \* \* \*

"MR. CONNOLLY: Your Honor, I would like to look at the statement that Mr. DeGoode gave to Lt. Merrill. I don't have a copy.

"Q  Do you have one on you, Mr. DeGoode?

"A  No, I don't.

\* \* \* \* \*

"Q  Do you remember making the statement in there you arrived in St. Paul on the 27th?

"A  I don't remember, but if it was in there, I made the statement, yes.

"Q  Is that, I take it, a mistake?

"A  I wouldn't say it was a mistake, Mr. Connolly. \* \* \* You want to remember I've been in solitary for a year and a half, that's the first time I had seen daylight that day, and I was pretty tired, a pretty tired guy.

"Q  In any event, you did not lie in the statement?

"A  Not intentionally. Why should I lie? If it was a mistake, I made it honestly, or I think I did.

"Q   Would you answer this next question yes or no: In the statement you made no reference to the O'Hara robbery, this Irishman you're talking about over in Minneapolis?

"A   I don't think I did. I don't know.

"Q   You *remember in federal court saying you remember definitely that you did?*

\*   \*   \*   \*   \*

"A   I don't know.

\*   \*   \*   \*   \*

"Q   Answer this next question yes or no: Do you remember in the statement saying you checked out of the Ryan Hotel after Tony DeVito had been kidnapped?

"A   Did I say that? Are you asking me that I said that?

\*   \*   \*   \*   \*

"Q   Did you say that in the statement? Yes or no.

"A   I don't know. If it's in the statement, I said it at the time. Yes, sir. I've got to stand on the statement I made. I can't recall the exact words." (Italics supplied.)

Because of this cross-examination, DeGoode's 1958 statement was received over defendant's objection. At the same time the trial judge suggested that he would be receptive to a motion to delete any parts of it to which defendant's attorney might take specific objection on valid grounds. He said: "You may look at it and examine it. And we may later decide *before it gets to the jury* that certain portions are definitely objectionable." (Italics supplied.) The record before us does not show that defendant ever focused his attack on any particular assertion appearing in the exhibit, his position being, apparently, that no part of it should be received.

Under these circumstances, where an attempt was made upon cross-examination to impeach the testimony of an accomplice testifying as a witness for the state in such a way as to raise the inference that his testimony as given at trial is fabricated, the admission of prior consistent written statements is within the discretion of the trial court—to

be exercised with caution and discrimination to avoid unjustified and substantial prejudice to the defendant.[3]

In this case the prosecutor called six witnesses whom he asked leave to cross-examine, and in each instance the request was granted. These witnesses were Joseph Forese, proprietor of the Italian Village, where, according to DeGoode, he, Lupino, Azzone, and Cimin had been before going to the site of the crime; Anthony Legatto, who according to the theory of the prosecution led DeVito to the place where he was kidnaped; Shirley Curran, Legatto's girl friend; Anthony Petrangelo, the real owner of the 1950 Dodge automobile in which DeVito and Legatto drove from Heinie's Bar on Wabasha Street to Jack's Restaurant just before the kidnaping; Petrangelo's wife, Gail; and Sam Cimin, who according to DeGoode participated in the crime. In each instance the witness was called by the state and, after being called, gave testimony which, according to the prosecution, failed to comply with expectations. Under such circumstances, it is permissible to impeach the witness by reference to prior statements, not for the purpose of establishing facts, but only to negate the unfavorable testimony given by the witness.[4] Surprise does not exist if the prosecution is aware that the testimony of the witness will be unfavorable before the witness is placed on the stand. The record does not establish that the county attorney did in fact anticipate unfavorable testimony from the witnesses called. The situation is unique, in part because these witnesses were all friends or acquaintances of defendant, and because over 6 years had elapsed between the time of the events with respect to which they were asked to testify and the time of the trial. We have reviewed the proceedings involving the testimony of these witnesses and have concluded that prejudicial error does not appear on this aspect of the case.

We note that John Azzone, an alleged accomplice, was called as a witness by the state. After giving his name he stated: "Well, sir, I am

---

[3]See, State v. Lynch, 192 Minn. 534, 257 N. W. 278; Annotations, 140 A. L. R. 168 and 75 A. L. R. (2d) 959.

[4]See, State v. Dahlgren, 259 Minn. 307, 107 N. W. (2d) 299; State v. Lemke, 207 Minn. 35, 290 N. W. 307.

under this indictment the same as Mr. Lupino is. I plead not guilty. My case is set to follow his, and I refuse to answer any questions on the grounds they might tend to incriminate me." The witness was then excused.

It does appear from the record that the prosecuting attorney who called the witness knew that the privilege of self-incrimination would be asserted. The record does not disclose any pretrial effort by the defendant to avert the situation that has been described. State v. Mitchell, 268 Minn. 513, 130 N. W. (2d) 128, is therefore controlling and there is no reversible error on this ground.

Defendant claims prejudice also because a woman juror reported to the court that she had been threatened over the telephone and told to vote not guilty or else. The trial judge discussed this development with the juror at a time when Lieutenant Ralph Merrill, one of the state's witnesses, was present. There is no showing that Lieutenant Merrill communicated with this juror in any way and it appears that he was present because the assignment of personnel to afford protection to a person so threatened was within the area of his responsibility. Defendant's attorney moved for a mistrial. No discussion is needed to demonstrate why a law-enforcement officer appearing as a witness in a criminal case should remain aloof from jurors who will be called upon to evaluate the testimony. The record shows that the trial judge was alert to the situation and we are satisfied that the matter was handled properly and without prejudice to the rights of the defendant.

We affirm the conviction. True, no one called as a witness except DeGoode placed Lupino at the site where the kidnaping allegedly occurred. He testified that he was at home at the time and he was supported in this by his wife and mother. On the other hand, in addition to the statements of DeGoode, there is evidence which establishes that so long as DeVito was a potential witness against Lupino in the burglary case pending in South Carolina, defendant had a particular motive for causing him to disappear. We have the testimony of Mussehl that Lupino had said that unless DeVito agreed to change his testimony he would be eliminated. Association under unusual circumstances

between the alleged participants in the crime before and after its alleged occurrence is established. The testimony that shortly after the alleged kidnaping Lupino was in possession of the Dodge automobile in which DeVito had been riding shortly before his disappearance was subject to explanation. But the defendant, taking the witness stand, gave no explanation of this critical testimony. He denied it. It is also true that the body of DeVito has never been located. But the fact that he was seen on the early morning of September 28, 1953, at about 1 a. m. and has never been seen since makes it credible that he was kidnaped and murdered to assure his silence. The admitted and unusual circumstance that Lupino left Minnesota within 48 hours of DeVito's disappearance, choosing Rochester rather than the Wold-Chamberlain field as a point of departure, leaves an inference of flight to avoid apprehension. Testimony offered on behalf of the defendant to the effect that he chose to go to Rochester at this particular time in order to borrow money from a friend is not persuasive. Placed in this background, the testimony of DeGoode becomes believable and the jury was justified in accepting it. Considering the matter in its entirety, we are satisfied that the verdict is sustained by the evidence and that the proceedings were conducted in conformity with law.

Affirmed.