STATE of Minnesota, Respondent,

v.

Johnny JONES a.k.a. John Quincy Jones, Appellant.

No. 47806.

Supreme Court of Minnesota.

Aug. 18, 1978.

Rehearing Denied Oct. 5, 1978.

C. Paul Jones, Public Defender, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., William Randall, County Atty., Steven DeCoster, Asst. County Atty., St. Paul, for respondent.

PER CURIAM.

Defendant was charged with one count of second-degree murder and one count of third-degree murder in the September 6, 1976, shooting death of George Carlson in St. Paul. A Ramsey County District Court jury found defendant guilty of the lesser of the two offenses and the court sentenced him to a term of 3 to 25 years in prison, Minn.St. 609.11 and 609.195. On this appeal from judgment of conviction defendant contends (1) that the evidence of his guilt was legally insufficient, (2) that the trial court erred in denying a pretrial motion to limit the prosecutor's impeachment of defendant by prior conviction, with the result that defendant was compelled to forego testifying in his own behalf, (3) that the trial court denied defendant a fair trial by injecting himself into the trial in an improper manner, and (4) that the trial court erred in its instructions on the issue of self defense. We reverse and remand for a new trial.

On Labor Day, September 6, 1976, defendant worked the late afternoon-early evening shift at his job as a mechanic for Burlington-Northern. After getting off work defendant apparently got in his car and began to drive to his apartment in the

new apartment complex at 314–329 Congress Street. Defendant and the woman he was living with, Sharon Adams, along with two of his three children, had just moved into the apartment a few days earlier. At about 10:30 p. m., as he was driving in his car in a southerly direction on the Lafayette Freeway, defendant had a minor collision with the car of the victim, George Carlson. Because Carlson is deceased, there is no way of knowing for sure what happened. However, defendant told police officers that Carlson sped up and slowed down to prevent him from getting into the right lane and onto the exit ramp at Concord Street. Later examination of the two cars by a criminalist revealed fresh damage to the right fender of defendant's car and the left rear of Carlson's car, evidence which is at least consistent with defendant's version.

Defendant later told the police that he had chased Carlson's car from the exit ramp to the corner of Ada and Robie Street. According to defendant, Carlson got out at that point and fired two shots at him from a .22-caliber semi-automatic handgun. There appears to be no doubt that Carlson fired two shots, although we do not know for sure if he actually fired at defendant. We say this because (a) later examination of Carlson's right hand showed traces of lead consistent with his having fired a gun, (b) Carlson's gun, an 8-shooter, had five live rounds in the clip and one in the chamber when it was examined by police, and (c) three different people living near this corner heard two shots which sounded like shots from a .22-caliber gun. One of these neighbors saw defendant's car back up the entire length of the block at a relatively high speed and take off for his apartment.

It was about this time that a third person, a contractor named Armond Winter, came upon Carlson, who was standing by his car, and talked with him. We do not know what was said, but after talking with Carlson, Winter looked and saw defendant's car about a block away. Winter followed defendant and observed him drive into the parking lot of the apartment complex in which defendant lived. Winter then drove back to where Carlson was, told him where defendant's car had gone, and told him that he would call the police and that Carlson should drive to that lot and wait until the police arrived.

Meanwhile, defendant had arrived at the lot where he sat in his car for a minute or two. He later told the police that when he got out he checked his car for bullet holes, then took his rifle from the trunk of his car and walked toward the building. Martin Trulsen, a student at the University of Minnesota, was leaving after visiting some friends when he saw defendant get out and walk toward the building. Trulsen did not testify whether or not he had seen defendant carry a weapon. However, Sharon Adams testified that defendant generally kept his rifle in the trunk of the car in the daytime so that the kids would not use it, but took it in at night.

Apparently as defendant was about to enter the building, Carlson drove into the lot and parked his car in such a way that it would be difficult for anyone to get out. Defendant later said that he decided he did not want "this guy" to "mess" with his family and kids, so he got back in his car and tried to leave but Carlson blocked his way. Trulsen by then was in his car and was driving right behind defendant. Trulsen was listening to music from his tape deck and did not hear exactly what was said, but after 30 seconds or so he saw defendant get out of his car carrying the gun and could tell that there were "intense" words. One neighbor heard defendant say, "Get out mother fucker." Neither Trulsen or this neighbor knew whether Carlson said anything and neither of them or anyone else other than defendant saw Carlson, so we really do not know what, if anything, Carlson said or did. We do know that defendant walked to the front of his car, which was head-on with Carlson's, raised the gun and aimed it, then put it in a hip position. Trulsen, the only person other than the victim who observed everything defendant did, testified that defendant stood for about 30 seconds by the left front of Carlson's car, continued to order Carlson

out, and then fired one shot from the hip position. The shot went through the front windshield and struck Carlson, who fell forward against his horn. Defendant then walked toward the apartment and yelled to Sharon Adams to call an ambulance, call the police, and call Nilva (possibly his attorney) because he had shot somebody who had been shooting at him out on the freeway.

The police arrived within minutes after the shooting. The caretaker testified that she observed defendant flag the police down as they arrived, but the police did not corroborate this. Defendant was slow in putting his rifle down. The officers ordered defendant to lie down on the ground, face down. Defendant's girl friend, who was outside by then, pointed to the victim's car. As one of the policemen approached Carlson's car, defendant yelled to the officer that Carlson had a gun. The officer found Carlson dying. In the backseat the officers found the gun which Carlson had fired earlier.

After placing defendant in the squad car and giving him a *Miranda* warning, one of the officers talked to defendant, and defendant related his version of what happened. Asked why he shot, defendant replied that he shot at him because the man "moved funny" and he did not want to be shot at by the man again. Asked what he meant by "funny," defendant replied "Just funny." The officers asked him if the man pointed a gun at him or raised his hands up, and defendant replied that he "just moved funny."

Defendant was found guilty of third-degree murder, specifically, unintentionally killing Carlson while committing an aggravated assault upon him.

1. The most important of the issues relating to the conduct of the trial is the issue of the trial court's denial of the pretrial motion to limit impeachment.

Defendant's trial counsel first moved at the Rasmussen hearing to limit the prosecutor's impeachment of defendant by prior convictions at trial. Defendant's prior convictions include the following: a 1960 conviction in Oklahoma for second-degree rape, a 1961 conviction in Missouri for theft, a 1964 conviction for simple assault in Minneapolis (aiming a gun at a person), a 1965 conviction for aggravated assault in Minneapolis, and a 1971 conviction for simple assault in St. Paul. Defense counsel argued basically that all of the convictions were too remote to have any conceivable relevance to the issue of defendant's credibility with the exception of the 1971 conviction for simple assault; he urged the court to bar the prosecutor from cross-examining defendant about all but the one conviction. The trial court, at defense counsel's request, reexamined *State v. Stewart,* 297 Minn. 57, 209 N.W.2d 913 (1973), in which this court in the interests of justice reversed a conviction where the prosecutor had cross-examined a defendant about an 8-year-old burglary conviction. However, the trial court distinguished the *Stewart* case and denied the motion, stating that he felt that the general rule, reaffirmed in *State v. West,* 285 Minn. 188, 173 N.W.2d 468 (1969), required him to leave to the prosecutor the decision whether to use the prior convictions to impeach defendant.

The defense counsel raised the issue once again at the conclusion of the state's evidence, also raising a new point, specifically, that two of defendant's prior convictions, the 1960 and the 1961 ones, were convictions obtained while defendant was unrepresented by counsel. Defense counsel argued that because of this at least these two convictions could not be used to impeach defendant. The trial court stated that counsel was too late in raising this point and on that ground denied this part of defendant's motion. (Defendant does not raise this issue on appeal.) Additionally, the trial court again read the *Stewart* case and again denied the broad motion to suppress as too old and therefore irrelevant all the convictions but the one obtained in 1971. In doing so, the court stated again that he felt he did not have any discretion in the matter. Defense counsel then informed the court that under the circumstances defendant would not take the stand and testify in his own behalf.

In its brief on appeal the state cites *State v. Senske*, 291 Minn. 228, 190 N.W.2d 658 (1971), as authority for the proposition that by not taking the stand defendant waived his right to raise this issue on appeal. In *Senske* the defendant asked this court to rule on the constitutionality of Minn.St. 595.07, which deals with impeachment of witnesses by prior crimes, but this court refused to do so because defendant had not testified and therefore, in this court's opinion, had not given the trial court an opportunity to rule on the matter. Specifically, this court stated as follows:

"An appellate court cannot consider matters which were not properly raised and decided at the trial. This court will not issue an advisory opinion on this issue. Had the defendant taken the stand and had the trial court allowed the prosecutor to cross-examine him, we could base a decision on a complete record without going beyond the matters actually raised at trial. Defendant will not be allowed to refuse to testify, hoping that the jury will acquit him, and still have the option for a reversal by testing the constitutionality of § 595.07 upon conviction." 291 Minn. at 232, 190 N.W.2d at 661.

There are two possible reasons underlying the court's decision in *Senske*, one that the issue was never properly raised in the trial court, two that in order to preserve an issue of this sort a defendant must take the stand. We do not agree that Senske stands for the latter proposition.

■ Under the circumstances, the defendant did everything he could to preserve the issue. To say that in order to preserve

the issue defendant should have testified seems to us unreasonable when the practical effect of the ruling in this case was to keep defendant off the stand. It could be argued that he refused to testify hoping that the jury would acquit him and he would still have the opportunity to raise the issue on appeal if he was convicted; but if he had testified, it is also reasonable to say that he hoped for an acquittal but wanted the option of raising the issue if he was convicted. In summary, the issue was properly raised in the trial court and there was no waiver. See, *Weaver v. United States*, 133 U.S.App.D.C. 66, 408 F.2d 1269 (1969), certiorari denied, 395 U.S. 927, 89 S.Ct. 1785, 23 L.Ed.2d 245 (1969).

The rule which the trial court followed is the rule of *State v. West*, 285 Minn. 188, 173 N.W.2d 468 (1969), that the discretion to use prior crimes to impeach a defendant is the discretion of the prosecutor, not the discretion of the trial court. This is the rule which this court in the *Stewart* case declined to revise but which has been revised by Rule 609, Rules of Evidence.

Rule 609 and the other Rules of Evidence were not in effect at the time of this trial. If Rule 609 had been in effect, then the trial court would have had the discretion to restrict the prosecutor's use of the prior convictions and the prosecutor would have been barred from using the older ones without first making a specific showing of unusual need.[1] Some of the factors which the trial court would have had to consider in determining whether to restrict the use of each of the more recent prior crimes are:

1. "(a) General rule.—For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime

"(1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, or

"(2) involved dishonesty or false statement, regardless of the punishment.

"(b) Time limit.—Evidence of a conviction under this rule is not admissible if a period of

more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect. However, evidence of a conviction more than 10 years old as calculated herein, is not admissible unless the proponent gives to the adverse party sufficient advance written notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence."

(1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue. See, 3 Weinstein, Evidence, pp. 609.64 to 609.80.4.

In the instant case, it was extremely important that the jury hear the story of the defendant. It is true that the jury heard the police officer testify as to what defendant said to them shortly after the shooting. But if defendant had testified, he might have been able to explain what he meant by "funny move." The jury, by listening to him testify and by observing him, would have been able to better determine whether or not he was telling the truth about whether Carlson had made a "funny move," what he meant by "funny move," and whether it was reasonable for defendant to fire at Carlson under the circumstances.

While in the *Stewart* case we did not reverse the *West* case, we made it clear that there might be cases where the prosecutor's use of stale and irrelevant prior crimes to impeach a defendant (or the threatened use of such crimes in order to prevent him from testifying) would deprive the defendant of his right to a fair trial. Here we believe that is what happened: The defendant was clearly deterred from testifying by the threat of admission of prior convictions which were not only stale but highly prejudicial and irrelevant to credibility. Accordingly, we are compelled to reverse and remand for a new trial. Although the new Rules of Evidence were not in effect when this prosecution was commenced, we think it would be appropriate on retrial to apply the new rules, particularly on this issue of impeachment by prior crimes.

2. There is no merit to defendant's contention that there was as a matter of law insufficient evidence to convict.

3. In support of his third contention, that the trial judge injected himself unnecessarily into the trial in an improper manner, defendant points to the following three instances when the court interrupted defense counsel's cross-examination of Trulsen, the student who observed the shooting:

(a) "Q. And there is no question in your mind that at the time the shot was fired the gun was at hip level, it was not at shoulder level, correct?

"A. Right.

"Q. So therefore there was no way that the man shooting the gun could have been looking through the scope, correct?

"The Court: That sounds argumentative to me Mr. Peterson."

(b) "Q. And did you also think at one time that you possibly heard a third shot?

"A. I'm trying to think if I put that in the—in the report. I may have put that in the police report. I'm not sure. Although there is no—Now, in my mind there is no—that—I'm sure that point would have been in my mind. I remember the second shot—When I thought I heard the second shot because it heightened my emotion a bit more.

"Q. Okay. My question was do you recall that at one time you thought possibly there was a third shot which was fired?

"A. I'm not sure.

"Q. Okay. Do you recall telling that to the police that possibly one or two shots were fired after the first one?

"The Court: The witness has already answered that question, Mr. Peterson. It's repetitious.

"Mr. Peterson: Your Honor, I don't believe I asked him—

"The Court: Will you proceed, counsel."

(c) "Q. Okay. So I take it that you had neither seen the green car, nor the other car which was involved at any time previously that evening, is that correct?

"A. Not that I know of, no.

"Q. Okay. So you have no idea then as to what may have transpired between the drivers of those two cars previously that evening?

"The Court: The witness has disqualified himself from answering that question, Mr. Peterson."

The only other example cited by defendant is the following exchange during defense counsel's cross-examination of Officer James Gag, the St. Paul Police Department criminalist:

"Q. Did you conduct any examination on the pistol to determine when it had last been fired?

"A. I am aware of no reliable means of evaluating or estimating the time since a previous discharge.

\*     \*     \*     \*     \*     \*

"Q. Okay. And you similarly are unaware of any test, even when such residue in the barrel and against the breech face is present, to determine when a firearm has been last fired?

"The Court: That question is repetitious, counsel."

■ Our impression is that the court did take a fairly active role in the trial of this case. There is danger in a trial court doing that, especially if it were to happen that only the defense counsel's conduct necessitated interruption. However, in this case we do not think the trial court abused his authority or did anything that prejudiced defendant. In fact, the transcript indicates that the court similarly interrupted the prosecutor on at least three occasions and on the fourth occasion told the prosecutor to let him rule on an objection without any argument. The court's rulings on evidentiary objections appear to have been even handed and the jury certainly could not have gotten the idea from any of these rulings that the court favored the prosecution or the defense.

■ 4. The final argument of the defendant on appeal relates to the trial court's instructions on the issue of self-defense. Defendant contends that the trial court should have given the following requested instruction on retreat:

"A person who has been attacked and who is exercising his right of self-defense is not required to retreat and he not only may stand his ground and defend himself against the attack but may also pursue his assailant until he has secured himself from danger if that course appears to him, and would appear to a reasonable person in the same situation, to be reasonably necessary, and this is his right even though he might easily have gained safety by withdrawing from the scene."

The instructions which the court gave were as follows:

"Now, another statute which you must consider in your deliberations is known as 609.06 and .065, and that particular statute is entitled 'Authorized use of force and justifiable taking of life.' As you are aware, the Defendant has raised the defense in this case of self-defense and therefore these statutes have some applicability. 609.06 reads as follows:

" 'Reasonable force may be used upon or toward the person of another without his consent when the following circumstances exist or the actor reasonably believes them to exist:

" 'When used by any person in resisting or aiding another to resist an offense against the person.'

"The statute further says:

" 'The intentional taking of the life of another is not authorized under our statute except when necessary in the following cases:

" 'In resisting or preventing an offense which the actor reasonably believes exposes him or another to great bodily harm or death.'

"As one of his defenses in this case the Defendant has claimed that the acts were justified on September 6, 1976 because they were made in self-defense. In considering this case you must determine whether or not the Defendant, under the circumstances present on the evening of September 6, 1976, had reasonable grounds to believe that the acts of George Carlson were dangerous to him-

self, that is to the Defendant, John Jones. If you find that the Defendant had reasonable grounds to believe that any acts of George Carlson were dangerous to himself, then you must decide whether or not the force used by the defendant to repel any assault, if you find any, was necessary, and whether or not the amount of force used by the Defendant was required under the facts as they were disclosed by the evidence from the witness stand.

"You are further instructed that if a person is attacked or assaulted, he may use such force as he actually and honestly believes reasonably necessary in the situation he was in to defend himself. Where the use of force is justified, however, it must only be such force as was reasonable and appropriate to the situation that in fact existed. A person is not justified in using more force than is reasonable under the circumstances.

"What constitutes reasonable force in any given situation is a question of fact for you as jurors to decide. Furthermore, a person may lawfully use all force necessary in preventing or attempting to prevent an offense against his person. But here again that force must be of a kind limited to that which is in fact appropriate to the situation in which he found himself. The necessity of using force in self-defense may be either real or apparent, but the mere belief of a person that it is necessary to use force to prevent bodily harm to himself is not alone sufficient to make a case of self-defense for the facts as they appear to that person at the time must be such as to reasonably justify such belief.

"Self-defense is available only to those who act honestly and in good faith. The rule of self-defense, and the law of self-defense requires:

"One, the absence of aggression or provocation on the part of the slayer;

"Two, the actual and honest belief of the slayer that he was in eminent danger of death, great bodily harm, or some felony, and it was necessary to take the action he did;

"Three, the existence of reasonable grounds for such belief, and;

"Four, the duty of the slayer to retreat or avoid the danger if reasonably possible.

"Again, the use of force is justified, only such force may be used as is reasonably necessary to protect the person who claims justification or self-defense.

"You are further instructed that the burden does not rest upon the Defendant to prove that he acted in self-defense, rather the burden of proof is upon the State to satisfy you beyond a reasonable doubt that the acts of the Defendant were not in self-defense."

These instructions were taken from the text of decisions of this court and correctly state the law. While defendant's requested instruction is now incorporated in Jury Instruction Guide No. 7.08, that instruction in our opinion is not mandated.

Reversed and remanded.

SHERAN, Chief Justice (dissenting).

I would affirm the decision of the trial court upon the basis of *State v. West*, 285 Minn. 188, 173 N.W.2d 468 (1969). I do not dispute the authority of this court to grant a new trial in the interests of justice as was done in *State v. Stewart*, 297 Minn. 57, 209 N.W.2d 913 (1973). However, this authority should be used in only the clearest of cases. In the instant case, the verdict seems clearly justified.

SCOTT, Justice (dissenting).

I agree with the dissent of the Chief Justice. Furthermore, the jury heard the police officer testify as to the defendant's story. It is questionable whether the defendant would have testified in any event. The two most recent convictions could be used against him in the trial court's discre-

tion, even under the new rules of evidence that the majority would apply upon retrial. No offer of proof was made to show that the defendant's testimony would have added any facts not before the jury. I would affirm.

PETERSON, Justice (dissenting).

I join in the dissents of the Chief Justice and Mr. Justice Scott.

KELLY, Justice (dissenting).

I join in the dissents of the Chief Justice and Justice Scott.

GODFREY, J., took no part in the consideration or decision of this case.