STATE of Minnesota, Respondent,

v.

Thomas Thorne WARD, Appellant.

No. C8–83–1461.

Court of Appeals of Minnesota.

May 15, 1984.

Review Denied July 26, 1984.

C. Paul Jones, Public Defender, Kathy King, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Allen L. Mitchell, St. Louis County Atty., Mark S. Rubin Asst. St. Louis County Atty., Duluth, for respondent.

Considered and decided by POPOVICH, C.J., and FORSBERG and RANDALL, JJ., with oral argument waived.

## OPINION

FORSBERG, Judge.

This appeal is from a conviction for burglary, Minn.Stat. § 609.58 Subd. 2(2) (repealed). Appellant moved before trial for a change of venue due to pretrial publicity and for an order ruling that appellant's prior convictions would not be admissible against him for purposes of impeachment. The trial court at a pretrial hearing denied the motion for a change of venue and ruled that the prior convictions would be admissible for impeachment. At the sentencing hearing, the trial court sentenced appellant to 34 months executed sentence. We affirm.

## FACTS

On February 13, 1983, the Duluth home of State Senator James E. Ulland was burglarized while he and his wife were at home. Ulland pursued the intruder through the second floor of his house and out the front door, where he confronted him briefly. Ulland chased the intruder to an apartment building and called the police, who arrested appellant inside the building, in his mother's apartment.

The incident received limited newspaper coverage, as well as coverage in other media, the extent of which cannot be determined from the record. One of the articles reporting Ward's arrest was written so as to attribute responsibility for the burglary to Ward, citing an unnamed police source. The article was a short, four-paragraph story, otherwise factual in nature, which did identify the victim of the burglary as Senator Ulland.

In 1976, at the age of 16, Ward had been tried as an adult and convicted of the felony offenses of aggravated assault and burglary. For reasons that do not appear in the record, he served these sentences almost to expiration. He was released from Lino Lakes and given his final discharge papers on February 11, 1983, two days before the offense, and four days prior to his expiration date of February 15. The discharge papers were postdated to February 15, without any conditions being attached to his release.

## ISSUES

I. Did the trial court abuse its discretion in ruling that media coverage of appellant's arrest, which included an attribution of guilt by an unnamed police source in a newspaper article, did not require a change of venue?

II. Did the trial court abuse its discretion in ruling that appellant's seven-year-old convictions for assault and burglary were admissible against him for impeachment purposes?

III. Did the trial court err in assigning a custody status point for the commission of an offense while on release four days prior to expiration of sentence, with postdated final discharge papers?

## ANALYSIS

*Change of Venue*

Appellant concedes that this case did not receive publicity comparable to that accorded in other cases in which a change of venue has been ordered. *See, e.g., State v. Thompson,* 266 Minn. 385, 123 N.W.2d 378 (1963). Ward's argument is based largely on the attribution of guilt in a newspaper report of his arrest. That article stated as follows:

"Police say Ward was surprised by Ulland in a bedroom of Ulland's home Sunday afternoon. Ward ran from the home and Ulland chased him to a nearby apartment building where Ward later was arrested, police said."

Appellant's argument is based also on the role of Ulland, a prominent local public official, as the prosecution's chief witness.

Whether a change of venue should be granted because of pretrial publicity is a matter over which the trial court has wide discretion. *State v. Salas,* 306 N.W.2d 832 (Minn.1981). The standard of review is as follows:

"Before it can be concluded that the trial court has abused this discretion, it

must be shown that a real possibility exists that the jury will not render an unprejudiced or unbiased verdict."

*State v. Hogan,* 297 Minn. 430, 437, 212 N.W.2d 664, 669 (1973).

The volume of publicity accorded the Ulland burglary, as it appears from the evidence in the record, was insufficient to require a change of venue. The statement attributed to the unnamed police source, however, which expressed no qualification as to police reporting of Ward's involvement in the offense, was potentially prejudicial to his chances for a fair trial. In *State v. Thompson, supra,* the Supreme Court held that, in a first-degree murder case receiving enormous publicity, a change of venue was required, where such publicity included statements attributed to named police officers, including the chief of police and the head of the homicide unit, ascribing guilt to the defendant. *Cf., State v. Lupino,* 268 Minn. 344, 129 N.W.2d 294 (1964) (extensive publicity without dissemination of opinions of defendant's guilt by public officials did not require a change of venue).

The newspaper article in this case erred in failing to phrase the initial report of the burglary and arrest in terms of allegations against Ward rather than attributions of guilt. To find a "prejudicial atmosphere," *Thompson, supra,* 266 Minn. at 389, 123 N.W.2d at 381, however, which jeopardizes the defendant's right to a fair trial, requires a determination of the dissemination and likely effect of such a statement. The attribution of guilt in this case was not prominently displayed, given a named source in the police department, or dramatized as part of an ongoing investigation, in the manner of the *Thompson* news stories.

Nor did the involvement of Senator Ulland as a victim of the offense combine with these facts to raise the minimal publicity to a prejudicial level requiring a change of venue. The prospect of his trial testimony was not widely publicized. Nor was Ulland the type of "responsible public authorit[y]," *State v. Lupino, supra,* 268 Minn. at 352, 129 N.W.2d at 300, whose

statement may require a change of venue, since he was not a public official charged with investigation of the crime.

## Admissibility of Prior Convictions for Impeachment Use

The Minnesota Rules of Evidence permit the use of prior convictions to impeach a witness,

"... but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect, or (2) involved dishonesty or false statement, regardless of the punishment."

Minn. Rules of Evid., Rule 609(a). The State concedes that Rule 609(a)(2) was not advanced as grounds for admissibility at trial and is not available on appeal.

The Supreme Court in *State v. Jones,* 271 N.W.2d 534 (Minn.1978), identified five factors to consider in determining admissibility under Rule 609(a)(1):

"... (1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue."

271 N.W.2d at 538.

Ward's argument centers on the third *Jones* factor, the similarity of his prior burglary conviction to the charged crime, also burglary. The Supreme Court has considered the admissibility of prior convictions for identical offenses on numerous occasions. *See, State v. Lee,* 322 N.W.2d 197 (Minn.1982) (prior first degree murder conviction, prosecution for second-degree murder); *State v. Bellcourt,* 305 N.W.2d 340 (Minn.1981) (both aggravated robbery); *State v. Bettin,* 295 N.W.2d 542 (Minn. 1980) (both sexual offenses); *State v. Leecy,* 294 N.W.2d 280 (Minn.1980) (both ag-

gravated assault); *State v. Brouillette*, 286 N.W.2d 702 (Minn.1979) (both sexual offenses).

These cases indicate that, while the similarity of offenses increases the potential for prejudice, admissibility of the prior conviction must be decided based on all the factors identified in *Jones.*

The Supreme Court has not indicated the impeachment value of a prior burglary conviction. The Court has, however, expressed the view that Rule 609 itself "necessarily recognizes that a prior conviction, though not specifically involving veracity, is nevertheless probative of credibility." *State v. Brouillette, supra,* 286 N.W.2d at 708; *see also, City of St. Paul v. DiBucci,* 304 Minn. 97, 229 N.W.2d 507 (1975).

The age of Ward's prior convictions in this case might lessen their probative value, but for the fact that he had been imprisoned during virtually the entire period, and, therefore, the offenses "had not lost any relevance." *State v. Bettin, supra,* 295 N.W.2d at 546.

Although there is no indication what Ward's testimony would have been, the record does not show that his testimony would have been critical. The accuracy of eyewitness identification is not an issue on which a defendant's testimony is normally crucial. *Cf., State v. Bettin, supra* (Otis, J., dissent) (defendant claimed consent in sexual offense case). Moreover, because of Ward's apparent lack of corroborating evidence, his testimony would have had to rely heavily on his own credibility.

Considering all the factors identified in *Jones,* the trial court's ruling that the prior convictions were admissible for impeachment purposes was not an abuse of discretion. *See, State v. Lee,* 322 N.W.2d 197 (Minn.1982).

*Criminal History Score*

■ Ward's release from Lino Lakes with postdated final discharge papers placed him in an ambivalent custody status at the time the offense was committed, two days following his release, and two days before the expiration of his sentence. The trial court did not accept Ward's argument that he had been finally discharged, and gave him a custody status point, which increased his criminal history score to 3, and resulted in a presumptive sentence of 34 months, executed, rather than 30 months stayed.

The Sentencing Guidelines refer to five custody statuses that may result in a custody status point: probation, parole, supervised release, confinement, or release pending sentencing. Section II.B.2.; Comment, II.B.201. The Sentencing Worksheet includes two additional categories: escape, and "other." Ward's custody status was marked "other" on the Worksheet. We agree that Ward's status was custodial for the purposes of calculating his criminal history score.

The Supreme Court has held, under earlier statutes, that the paroling authority retains control and custody of the inmate until final discharge. *State ex rel. Bush v. Whittier,* 226 Minn. 356, 32 N.W.2d 856 (1948). In *Bush,* the former Board of Parole had, by written agreement, relinquished control of a parolee during his period of military service. The parolee later violated the conditions of his previously-granted parole. The Court rejected his argument that the relinquishing agreement constituted a final and complete discharge from parole, stating as follows:

"[Under the agreement], the board merely *relinquished control* and supervision 'during all of such time as he is in the United States Military Service.' This could not be construed as a final discharge.... The language used indicates merely that for a specified period of time the board agreed not to exercise the control which at all times it possessed and retained."

226 Minn. at 360–361, 32 N.W.2d at 859 [emphasis in original].

The Department of Corrections acted similarly here in releasing Ward prior to his expiration date. Ward gained his freedom but was still legally subject to the custody of the state until the effective date of his final discharge. The effective date

of the discharge papers here was not waived by the early release. *See, State ex rel. Lutz v. Rigg*, 256 Minn. 241, 98 N.W.2d 243 (1959). The postdating of those papers implied an agreement that Ward would remain law-abiding until his expiration date.

### DECISION

There was no abuse of discretion in denying appellant's motion for a change of venue, or in permitting the use for impeachment purposes of his prior convictions. The trial court correctly included a custody status point in calculating appellant's criminal history score.

Affirmed.

RANDALL, Judge (concurring in part and dissenting in part).

I concur with the majority on the affirmance of the conviction. I accept the analysis and opinion of the panel on the issue of change of venue and the issue of admissibility of prior conviction for impeachment use.

However, on the third legal issue, the computation of the defendant's criminal history score, I would reverse the decision of the trial court and remand the case for the imposition of a sentence based on a criminal history score of two rather than three.

The State accepted appellant's factual recitation of the relevant dates and background on this issue. The majority opinion also adheres to those basic facts. Appellant Ward was unconditionally released from the correctional facility at Lino Lakes on February 11, 1983. He was given his final discharge papers, postdated four days to February 15, his expiration date, and his gate money. He was told by correction officers he was on his own, and that he need not report back to Lino Lakes. He was not assigned a parole agent, was not presented with nor asked to sign a parole agreement, was given no specific do's or don'ts for the next four days, nor was he given anyone to report to within the next four days. The present offense on which he is being sentenced occurred on February 13, 1983, two days after his release, and two days prior to the final expiration of his sentence.

On this narrow and unique set of facts, defendant-appellant should not have been assigned a custody point. The sentencing work sheet involved showed five specific types of custody supervision, i.e., probation, parole or supervised released, confinement, release pending sentence, escape, and *other*. The probation officer doing the report checked the block marked "yes" on the question, "Was offender under custody supervision at time of current offense?", and then checked block # 6—"Other." The work sheet did not include an explanation of "other."

The Sentencing Guidelines, Sec. II.B.2 discuss a custody point for everything except "other." A fair interpretation of the Guidelines and the comments leaves an exact definition of "other" both unclear and arguable. It is basic law in Minnesota, and other jurisdictions, that penal provisions must be strictly construed, and ambiguities must be interpreted in favor of the defendant. *State v. Haas*, 280 Minn. 197, 159 N.W.2d 118 (1968). *See Minnesota Digest*, Vol. 15A–Statutes, Key # 241 *et seq.* (West, 1970). Although Ward's conduct, in being apprehended two days after his release in the act of prowling a home, is not indicative of rehabilitation nor of a real intention on his part to follow the one true way after spending years in prison, he is, nevertheless, a citizen of the state and entitled to all the legal presumptions and inferences afforded defendants appearing before a court on their first brush with the law.

The assignment of the point for custody status (a bad point equivalent to a point for a prior felony conviction) was *controlling* in determining the defendant's presumptive sentence. The burglary conviction in question, a level VI severity, called for 30 months with a presumptive stay with a criminal score of two, but the same offense with a criminal history score of three called for a presumptive 34 months incarceration at a state prison. Defendant Ward has two

legitimate and undisputed bad points for prior convictions, but the assignment of a custody point increased his criminal history score to three and shifted him automatically from a presumptive 30 months stay of execution to a presumptive 34 months incarceration in a state prison.

The Sentencing Guidelines, *supra,* do not include "other" as meriting a custody status point. Only the sentencing work sheet contains this category. The work sheet was drafted pursuant to rules promulgated by the Supreme Court, but that statute, granting the Supreme Court authority to promulgate rules, did not sanction a substantive addition to the five categories which would be considered custody status at time of offense. *See* Minn.Stat. § 609.-115, subd. 1(a); Minnesota Sentencing Guidelines II.B.2. and the comment thereto. Sentencing Guidelines comment II.B.201 identifies the types of custody supervision, and neither the guidelines nor the comment discusses "other." The Canon of Construction *Expressio Unius Est Exclusio Alterius* supports the concept of construing penal statutes strictly against the state and in favor of the defendant. Minn.Stat. § 645.-08.

The Sentencing Guidelines specifically mention certain types of custody status. They are silent as to what can constitute "other."

The trial court should not have included a custody status point in calculating Ward's criminal history score. He was not on probation, parole, supervised release, confinement, escape status, or released pending sentencing. He was not in custody. He was an undefined "other."

As far as we can determine what constitutes "custody" or "in custody" has not been addressed in Minnesota. Numerous cases in other jurisdictions discuss what is or is not custody for purposes of various matters such as being charged with the offense of escape from custody, *see State v. Ryan,* 62 Hawaii 99, 612 P.2d 102 (1980); and discussing whether or not one is in custody for purposes of good time, *see People v. Rodgers,* 79 Cal.App.3d 26, 144 Cal.

Rptr. 602 (1978). The spirit of the term "custody" seems universally to apply to some kind of restraint and/or supervision. A representative definition is found in *Spring v. Caldwell,* 692 F.2d 994 (5th Cir. 1982). To warrant the finding that a petitioner is in custody for purpose of Federal habeas corpus jurisdiction in a "fine-only" case, "...[t]here must be present some sort of supervisory control over the petitioner, that is, defendant's conduct must be subject in one degree or another to the direction of judicial officers. The existence of an imminent possibility of incarceration without a formal trial and criminal conviction may create such a restraint on liberty as to constitute custody." 692 F.2d at 998.

It is significant the sentencing work sheet uses this exact wording "Was offender under custody *supervision* at time of current offense?" (emphasis added). The respondent State of Minnesota concedes that no supervisory control, express or implied, written or oral, was given to Ward on his release on February 11th. *Spring v. Caldwell, supra,* relied on *Hensley v. Municipal Court, San Jose Milpitas Judicial District,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973). In that Supreme Court case, Justice Brennan stated the issue: "This case required us to determine whether a person released on his own recognizance is 'in custody' within the meaning of the Federal Habeas Corpus Statute." There a person released on his own recognizance awaiting execution of a sentence was determined to be "in custody" because he was subject to restraints not shared by the public generally: namely, the obligation among others to appear at all times and places as ordered by any court or magistrate of competent jurisdiction. He could not come and go as he pleased. His presence could be demanded at any time by state authority and he was subject to imminent incarceration without a formal trial and criminal conviction. Ward, on the other hand, was under no such controls. Had he committed a crime, or done some other bad act short of a crime, between his release on February 11th and February 15th,

the State could not have subjected him to a probation or parole revocation hearing, as no conditions of release had attached to lead to a violation. *See Morrissey v. Brewer,* 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), and *Gagnon v. Scarpelli,* 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973).

Had the custody point not been included, defendant's presumptive sentence would have been 30 months stayed and the prosecution would have been at liberty, at sentencing, to argue for an upward departure from the guidelines, if they felt departure applied. Equitably, with appellant having been certified at the age of 16 to district court and been sentenced to a state prison where he had served virtually to expiration, defendant should have been given the benefit of the doubt on his ambiguous custody status.

Prior authorities are distinguishable. In *State ex rel. Bush v. Whittier,* 226 Minn. 356, 32 N.W.2d 856 (1948), the State Board of Parole had, by written agreement, temporarily relinquished control of a parolee during his period of military service. Parolee later violated the conditions of his briefly granted parole. He argues that after military service and a lapse of time, he could not be brought back to prison for a parole violation because the relinquishing agreement to the military constituted a final and complete discharge from parole. The Minnesota Supreme Court rejected the parolee's argument and found that since the Board had merely relinquished control and supervision during the time parolee was to be in the U.S. military service, by definition it could not be construed as a final discharge. This case is not authority for the proposition that the effective date of Ward's discharge was not waived by his four-day early release. In *Bush, supra* it was clear the parolee's release to the military was temporary and conditional. Ward's release was final in the practical sense. He was given his discharge money, was not told to report to anybody or anything, was told he was on his own and was not given any conditions to comply with for the next four days.

*State ex rel. Lutz v. Rigg,* 256 Minn. 241, 98 N.W.2d 243 (1959), is inapplicable to Ward's case, as the following facts are clear in *Lutz:* Lutz was imprisoned in 1933 for a 15–20 year sentence, was specifically paroled in 1940 with specific parole terms to comply with until final discharge, and was brought back to Minnesota years later on a charge of failing to comply with specific parole terms. That could not possibly have happened to Ward as he was given no terms of parole. Lutz was not given post-dated discharge papers with his parole, and a careful reading of *Lutz* shows clearly that he was under specific parole conditions. *Lutz* is arguably good authority to support Ward's position that he was not on parole.

I would reverse on this issue and remand the case to the district court for resentencing.