*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A22-0835**

State of Minnesota,
Respondent,

vs.

John Kevin Melina,
Appellant.

**Filed May 13, 2024**
**Affirmed**
**Cochran, Judge**

Wright County District Court
File No. 86-CR-19-5687

Keith Ellison, Attorney General, Peter Magnuson, Assistant Attorney General, St. Paul, Minnesota; and

Brian Lutes, Wright County Attorney, Buffalo, Minnesota (for respondent)

Craig E. Cascarano, Minneapolis, Minnesota (for appellant)

Considered and decided by Cochran, Presiding Judge; Segal, Chief Judge; and

Smith, John, Judge.[*]

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**COCHRAN**, Judge

On appeal from his conviction for second-degree criminal sexual conduct, appellant argues that the district court abused its discretion by permitting the prosecution to question him about his prior convictions, limiting the scope of his cross-examination of a witness, and determining that he waived his right to be present when the jury was polled. Appellant further contends that the postconviction court abused its discretion by summarily denying his petition for postconviction relief. We affirm.

## FACTS

On June 6, 2019, police received a report that appellant John Kevin Melina had sexually assaulted his daughter, A.M. The report was made by K.M., the child's mother, the day after A.M. first revealed the alleged abuse to her mother. According to K.M., A.M. brought it up by saying that she wanted to talk about "something." Later that evening, A.M. asked her mother if she could sit under a blanket next to her and communicate via text message. In her ensuing text messages with her mother, A.M. disclosed that Melina had sexually abused her.

After K.M. reported the alleged abuse to police, K.M. took A.M. to Cornerhouse for a forensic interview. At the forensic interview, A.M. told the interviewer that, in 2017, Melina forced her onto a bed, pulled down her pants, and touched her vagina.

A.M.'s parents were never married and A.M., who was born in February 2009, lived mostly with K.M. In May 2017, Melina was granted physical custody of A.M., and she

lived with Melina for a short period of time beginning in May 2017 before returning to live with K.M. The alleged abuse occurred when A.M. was living with Melina in 2017.

In October 2019, respondent State of Minnesota charged Melina with one count of second-degree criminal sexual conduct in violation of Minnesota Statutes section 609.343, subdivision 1(a) (2016), arising from his alleged sexual assault of A.M. in 2017. The matter proceeded to a jury trial.

At trial, A.M. testified about the alleged sexual assault. A.M. testified that she was playing a game on her phone when Melina entered her bedroom, grabbed her, and placed her into a "praying position," with her "knees on the floor and [her] stomach on the bed." According to A.M., Melina then pulled down A.M.'s pants and underwear and touched her vagina with his hand. She testified that she was eight years old at the time.

K.M. testified about how her daughter revealed to her in 2019 that Melina had sexually abused her. A copy of the text messages from A.M. to her mother were admitted into evidence. K.M. also testified that she and Melina had been involved in "extensive civil proceedings" regarding custody of A.M. and other matters.

The detective who investigated A.M.'s allegations testified that he interviewed Melina in 2019 shortly after A.M.'s initial disclosure. The detective testified that Melina denied A.M.'s allegations, but that Melina also harbored "vague suspicions" that A.M. had been sexually abused elsewhere. Melina told the detective that A.M.'s abuse may have happened at a camp or foster home. The detective added that Melina also provided law enforcement with recordings of various conversations between Melina and A.M.

3

Melina testified in his own defense and denied the allegations. In addition, Melina testified that he recorded all of his conversations with A.M. and that in one recorded conversation, A.M. told Melina that she was going to lie to the police in order "to be with her mom." But, at trial, Melina did not introduce the recordings into evidence even though his attorney told the jury, during opening statements, that they would hear some of the recordings.

Upon questioning by his attorney, Melina admitted that he had been convicted of "too many [crimes] to count," although they were "[m]ostly traffic." He also noted that "he had no record at the time" that he was awarded custody of his daughter in 2017. During cross-examination, the state questioned Melina about his prior convictions of felony fleeing a police officer in a motor vehicle in 2018 and of domestic assault by strangulation in 2020.

The jury found Melina guilty of second-degree criminal sexual conduct. While the verdict was being read, Melina used a sharp object to cut his own neck. Melina drew the object across his neck multiple times. Melina then abruptly stood up with the sharp object in his hand. At that point, it was not clear to the judge whether Melina intended to harm others in the courtroom or engage in further self-harm. Multiple bailiffs attempted to subdue him. After Melina actively resisted the bailiffs' attempts, they intervened with chemical irritants and a taser. Melina was then taken by ambulance to a hospital for treatment due to his injuries and bleeding. The courtroom was rendered unusable because "there was a significant amount of blood." The district court determined that the trial could not proceed until a later date.

A few days later, the district court held a hearing with the parties to determine if there were any further proceedings in the case that required the presence of the jury. Melina requested jury polling, which would require the jury's presence. The state did not contest Melina's request to poll the jury, but argued that Melina, through his conduct, waived his right to attend the jury polling. The district court agreed with the state. The court ordered a "remote hearing" to conduct polling with counsel present but specified that Melina would not be permitted to attend because he had "waived his right to be present." At the remote hearing, each juror affirmed their verdict of guilty as true and correct.

Following a sentencing hearing, the district court sentenced Melina to 72-month's imprisonment. Melina appealed, and this court stayed his appeal while he pursued postconviction relief. We reinstated Melina's appeal after the postconviction court summarily denied Melina's petition.

## DECISION

Melina makes four arguments on appeal. First, he argues that the district court abused its discretion by allowing the state to impeach him with his prior felony convictions. Second, he asserts that the district court abused its discretion by limiting the scope of his cross-examination of K.M. at trial. Third, Melina contends that the district court erred by excluding him from the district court's polling of the jury after he was disruptive in the courtroom. Finally, Melina argues the postconviction court abused its discretion by summarily denying his petition for postconviction relief. We address Melina's arguments in turn.

5

**I.** **The district court did not abuse its discretion by permitting the state to impeach Melina with evidence of his prior felony convictions.**

We review a district court's ruling on the impeachment of a witness by prior convictions for "a clear abuse of discretion." *State v. Hill*, 801 N.W.2d 646, 651 (Minn. 2011) (quotation omitted). We will not reverse a district court's evidentiary ruling unless the appellant demonstrates that the district court abused its discretion and that the appellant "was thereby prejudiced." *State v. Reek*, 942 N.W.2d 148, 162 (Minn. 2020) (quotation omitted).

The rules of evidence provide that a district court may permit a party to use evidence of a prior conviction to impeach a witness when the prior crime is punishable by more than a year in prison and the court determines that the prior conviction's probative value outweighs its prejudicial effect. Minn. R. Evid. 609(a)(1). In exercising discretion under this evidentiary rule, district courts are required to balance five factors commonly referred to as the *Jones* factors:

> (1) the impeachment value of the prior crime, (2) the date of the conviction and the defendant's subsequent history, (3) the similarity of the past crime with the charged crime (the greater the similarity, the greater the reason for not permitting use of the prior crime to impeach), (4) the importance of defendant's testimony, and (5) the centrality of the credibility issue.

*State v. Swanson*, 707 N.W.2d 645, 654 (Minn. 2006) (quoting *State v. Jones*, 271 N.W.2d 534, 538 (Minn. 1978)). A district court errs when it rules on the admissibility of a prior conviction without demonstrating "on the record that it has considered and weighed the *Jones* factors." *Id.* at 655. But such error is harmless if appellate review

demonstrates that the conviction could have been admitted for impeachment purposes after a proper application of the *Jones* factors. *Id.*

Prior to trial, Melina filed a motion seeking to exclude any evidence of his criminal history. The state responded that, if Melina chose to testify at trial, the state should be allowed to impeach Melina with his prior felony convictions of domestic assault by strangulation and felony fleeing a peace officer in a motor vehicle. The district court "reserve[d] ruling on" the admissibility of the prior convictions until Melina "made the decision about whether or not [he] wish[ed] to testify."

At trial, Melina chose to testify in his own defense. Melina's attorney asked him on direct if he had been charged and convicted of any crimes, to which Melina responded, "Too many to count." But Melina also indicated that most of his convictions were for traffic offenses. On cross-examination, the state asked Melina specifically about his felony convictions of domestic assault by strangulation and fleeing a peace officer. The state engaged in this cross-examination even though the district court never revisited the admissibility of Melina's prior felony convictions for impeachment purposes.

Based on the rule announced in *Swanson*, we conclude that the district court erred when it permitted this cross-examination without first addressing the admissibility of Melina's prior felony convictions. The district court's decision was an error because the court did not "demonstrate on the record that it ha[d] considered and weighed the *Jones* factors." *See id.* To determine whether the district court's error was harmless, we independently apply the *Jones* factors as set forth below. *See id.*

7

## A. The Impeachment Value of the Prior Crime

The first *Jones* factor contemplates "the impeachment value of the prior crime." *Jones*, 271 N.W.2d at 538. Melina claims that the two prior convictions "are unrelated to [his] truth or veracity" and therefore are of little value. The supreme court has held that "*any* felony conviction is probative of a witness's credibility, and the mere fact that a witness is a convicted felon holds impeachment value." *Hill*, 801 N.W.2d at 652. And this court has observed that "a crime need not relate directly to truth or falsity to be admissible." *State v. Hochstein*, 623 N.W.2d 617, 624 (Minn. App. 2001). Accordingly, Melina's felony convictions for domestic assault by strangulation and fleeing a police officer hold impeachment value, and Melina has not demonstrated that the first *Jones* factor weighs against admissibility.

## B. The Date of the Conviction and the Defendant's Subsequent History

Under the second *Jones* factor, courts assess "the date of the conviction and the defendant's subsequent history." *Jones*, 271 N.W.2d at 538. Courts applying this factor often focus on the ten-year-limitation period defined in rule 609(b): "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date . . . ." Minn. R. Evid. 609(b); *see also State v. Gassler*, 505 N.W.2d 62, 67 (Minn. 1993).

Here, there is no dispute that the prior convictions occurred within ten years of the impeachment at hand. Thus, none of Melina's prior convictions were "stale" for purposes

of rule 609(b), and the second *Jones* factor does not weigh against their admissibility for impeachment purposes.  *See Gassler*, 505 N.W.2d at 67.

## C.  Similarity of the Past Crime with the Charged Crime

The next *Jones* factor requires us to compare "the similarity of the past crime with the charged crime."  *Jones*, 271 N.W.2d at 538.  "[T]he greater the similarity, the greater the reason for not permitting use of the prior crime to impeach."  *Id.*  As the *Gassler* court stated, "[o]bviously, if the prior conviction is similar to the charged crime, there is a heightened danger that the jury will use the evidence not only for impeachment purposes, but also substantively."  505 N.W.2d at 67.

Melina acknowledges that the prior convictions of domestic assault by strangulation and fleeing a police officer are "unrelated to the charged crime" of second-degree criminal sexual conduct.  Accordingly, the risk of those prior convictions unfairly prejudicing Melina is lower due to their dissimilarity to the charged offense.  *See id.*  Thus, the third *Jones* factor does not weigh against the admissibility of Melina's prior convictions for impeachment.

## D.  The Importance of the Defendant's Testimony and the Centrality of Credibility

The fourth and fifth *Jones* factors are "the importance of defendant's testimony" and "the centrality of the credibility issue."  *Jones*, 271 N.W.2d at 538.  Here, the parties do not dispute that credibility was a key issue in this case.  "If credibility is a central issue in the case, the fourth and fifth *Jones* factors weigh in *favor* of admission of the prior

convictions." *Swanson*, 707 N.W.2d at 655 (emphasis added). In a case involving charges of criminal sexual conduct, the supreme court observed that:

> [T]he general view is that if the defendant's credibility is the central issue in the case[—]that is, if the issue for the jury narrows to a choice between defendant's credibility and that of one other person[—]then a greater case can be made for admitting the impeachment evidence, because the need for the evidence is greater.

*State v. Ihnot*, 575 N.W.2d 581, 587 (Minn. 1998) (quotation omitted).

Here, as Melina acknowledges, the central issue was whether the jury believed A.M. or Melina. Because of the undisputed, central role of credibility in this case, both the fourth and fifth *Jones* factors favor admissibility of Melina's prior convictions.

Accordingly, two of the *Jones* factors favor admissibility of the prior convictions and the three other factors do not weigh against their admissibility. Therefore, we conclude that the district court did not abuse its discretion in allowing the state to impeach Melina with his prior convictions. Although the district court should have expressly ruled on the admissibility of Melina's convictions under the *Jones* framework prior to their introduction, its failure to do so was harmless in light of our conclusion that the *Jones* factors do not weigh against admissibility. *See Swanson*, 707 N.W.2d at 655-56.

## II.     The district court did not abuse its discretion by defining the scope of Melina's cross-examination of K.M.

Rulings on evidentiary matters, such as the scope of cross-examination, are within the "sound discretion of the district court" and we will not reverse such a ruling "absent a clear abuse of discretion." *State v. Glover*, 4 N.W.3d 124, 136 (Minn. 2024) (quotation omitted). Yet the district court's discretion in determining the scope of cross-examination

is limited by the defendant's constitutional right to cross-examine the witnesses against him. *Id.*; U.S. Const. amend. VI; Minn. Const. art I, § 6. Cross-examination allows a defendant to reveal a witness's potential motives or biases. *State v. Lanz-Terry*, 535 N.W.2d 635, 640 (Minn. 1995); *see also Davis v. Alaska*, 415 U.S. 308, 315-17 (1974) (describing cross-examination's important role in testing the credibility of a witness). "The right to confront witnesses is not violated by limitations on cross-examination so long as the jury is presented with sufficient information from which to appropriately draw inferences as to the witness's reliability." *Glover*, 4 N.W.3d at 136 (quotation omitted).

Melina claims that the district court "gutted" his ability to cross-examine K.M. regarding evidence that Melina asserts is relevant to his theory that K.M. and A.M. were "plotting to preclude [Melina] from [having] any contact with [A.M.]." According to Melina, "[s]aid efforts included but were not limited to [A.M.] lying about the sexual assault and the mother's litigious behavior." With regard to the latter, Melina argues that the district court precluded him from cross-examining K.M. about the substance of K.M.'s "numerous attempts" between 2017 and 2019 to file orders for protection (OFPs) against Melina. Melina asserts that such cross-examination would have bolstered his defense theory. But, in his brief, Melina does not clearly identify a specific ruling by the district court that he contests. Instead, he makes a general argument. As a result, we are hampered in our review of Melina's challenge. To the extent we are able to review Melina's challenge, we conclude that he has not demonstrated that the district court abused its discretion or violated his Sixth Amendment right to cross-examination of K.M.

Melina avers that the district court limited his cross-examination of K.M. by suggesting that Melina refer to the other proceedings involving K.M. as "civil proceedings" during his cross-examination. The issue arose because, at trial, Melina wanted to question K.M. about her attempts to renew an OFP against Melina, claiming that "the renewal of the OFP [was] the motivation" for K.M. to encourage A.M. to fabricate the sexual-abuse allegations against Melina. The district court determined that if Melina asked K.M. substantive questions about the OFP renewal, it would "open the door for inquiry [by the state] into the basis for that [OFP]." The district court was concerned that such questioning could lead to the jury hearing evidence of the underlying misconduct by Melina that led to the OFP, noting this evidence could be prejudicial to Melina. Ultimately, the district court "invite[d]" Melina to question K.M. about whether there were "extensive civil proceedings" involving the parties and their child. The district court also allowed Melina to ask K.M. if "there was a hearing scheduled on one of these civil matters on June 6, 2019," which was around the time A.M. made her initial disclosure to K.M. But the district court instructed Melina's attorney to approach the court before inquiring any further about the substance of the civil proceedings involving the OFP.

Regarding custody of A.M., the district court permitted Melina to question K.M. about police reports she had made and about whether Melina lost custody of A.M. as a result of those reports. However, due to hearsay concerns, the district court forbade questioning on "anything else that would be outside the knowledge of the parties," such as the conclusions of the police officers. The district court did approve Melina's request to

12

use the police reports to refresh K.M.'s recollection in the event she testified that she did not remember making the reports.

In sum, the district court permitted Melina to probe K.M. about the extensive civil litigation history between K.M. and Melina and the fact that she made several calls to police while A.M. was in Melina's custody. The district court's rulings did not materially limit Melina's ability to demonstrate K.M.'s potential bias or ulterior motive. In fact, defense counsel highlighted K.M.'s testimony in this regard during his closing argument. Counsel asserted that, despite several police reports initiated by K.M. when Melina had custody of A.M., "nothing was found." Counsel also argued that around the time A.M. first disclosed Melina's alleged abuse, there were "[e]xtensive civil filings" between K.M. and Melina and "the custody case continued." In other words, despite the district court's evidentiary rulings, Melina was still able to present his theory that A.M. and K.M. were conspiring to preclude Melina from having any contact with A.M.

The record does not support Melina's claim that the district court "gutted" his ability to cross-examine K.M. Instead, the record reflects that the district court permitted Melina to cross-examine K.M., and merely cautioned Melina to approach the court before asking detailed questions about the basis for the OFP. And the district court did so to guard against any potential prejudice to Melina. Even with the district court's limitations on the cross-examination, Melina was still able to present the jury "with sufficient information from which to appropriately draw inferences as to [K.M.'s] reliability." *Glover*, 4 N.W.3d at 136 (quotation omitted). We therefore conclude that the district court did not violate Melina's right to confront K.M., and we discern no clear abuse of discretion in the district

court's rulings regarding the scope of K.M.'s cross-examination. *See id.*; *State v. Whittle*, 685 N.W.2d 461, 466 (Minn. App. 2004), *rev. denied* (Minn. Oct. 19, 2004).

### III. The district court did not abuse its discretion by determining that Melina, through his conduct, waived his right to be present for polling of the jury.

Melina argues that the district court abused its discretion by polling the jury in his absence after he requested jury polling. The federal and state constitutions do not guarantee a defendant the right to have the district court poll the jury after the verdict is announced. *State v. Bey*, 975 N.W.2d 511, 518 (Minn. 2022). But the rules of criminal procedure provide that, if requested by either party, the district court "must poll the jury." Minn. R. Crim. P. 26.03, subd. 20(5)(a). Polling ensures a unanimous verdict and affords jurors a chance to "object if they disagree." *Bey*, 975 N.W.2d at 517.

Relatedly, the rules of criminal procedure provide that a defendant "must be present" at "every stage of the trial," including during the polling of the jury. *See* Minn. R. Crim. P. 26.03, subd. 1(1); *see also State v. Ware*, 498 N.W.2d 454, 457 (Minn. 1993) (holding that the rules give defendants the "right to be present during the return of the verdict, including the polling of the jury"). But a defendant can implicitly waive the right to be present when "[t]he defendant, after warning, engages in conduct that justifies expulsion from the courtroom because it disrupts the trial or hearing." Minn. R. Crim. P. 26.03, subd. 1(2)(2); *see also State v. Cassidy*, 567 N.W.2d 707, 709 (Minn. 1997).

"This court reviews a decision [of the district court] to proceed with trial with the defendant absent under an abuse-of-discretion standard, and this court will not disturb the [district] court's factual findings unless clearly erroneous." *State v. Martin*,

723 N.W.2d 613, 620 (Minn. 2006) (quotation omitted). "[E]ven if a defendant is wrongly denied the right to be present, the defendant is not entitled to relief if it can be said that the error was harmless error beyond a reasonable doubt." *Ware*, 498 N.W.2d at 457-58.

Here, the district court polled the jury without Melina present after determining that Melina had waived his right to be present "in any manner" at jury polling. The district court reached this conclusion based on Melina's conduct in the courtroom where he cut himself repeatedly. To ensure that the jurors would participate in polling, and "to protect the integrity of the [c]ourt process," the district court ordered that jury polling would occur virtually and that Melina could only appear through counsel.

We conclude that the district court did not abuse its discretion by proceeding with polling in Melina's absence because the record supports the district court's conclusion that Melina implicitly waived his right to be present during jury polling. Just prior to the reading of the verdict, the district court cautioned Melina that he "must maintain [his] composure." Despite this warning, after the clerk read the guilty verdict, Melina cut his throat multiple times in the presence of the jury. Melina's neck began to bleed, yet he actively resisted the bailiffs' attempts to subdue him. The district court found that Melina's conduct was "disruptive," "dangerous," and "posed a safety threat to everyone present." The district court also found that Melina's conduct left the jury "shaken and visibly traumatized." Melina does not challenge these factual findings, and nothing in the record suggests that they are clearly erroneous. *See Martin*, 723 N.W.2d at 620. These facts amply support the district court's conclusion that Melina waived his right to be present for the jury polling. *See* Minn. R. Crim. P. 26.03, subd. 1(2).

15

We are not persuaded otherwise by Melina's argument that "he could have appeared [at the jury polling] remotely via Zoom, and any trauma would have been mitigated," and therefore the district court abused its discretion when it excluded Melina. Melina fails to acknowledge that the district court specifically rejected this possibility, determining that "there is a high likelihood that even [Melina's] remote presence would retraumatize the jurors." The district court emphasized that "even if he does not speak, [Melina's presence] would be highly detrimental to the jurors' feelings of safety and could make their trauma significant and risk permanent emotional harm." The district court added that the jurors might refuse to participate in further proceedings if Melina were present. The record supports the district court's findings. We discern no abuse of discretion by the district court in its decision to decline Melina's request to appear remotely at jury polling.

Regardless, Melina has failed to show that he was prejudiced by the district court's decision to exclude him from jury polling. *See Ware*, 498 N.W.2d at 457-58. Instead, Melina summarily asserts that the district court's alleged error was "monumental" and demands a new trial. To the extent that Melina is arguing that his exclusion from jury polling constitutes structural error, we are unconvinced.

"Structural error represents a very limited class of errors . . . ." *State v. Dalbec*, 800 N.W.2d 624, 627 (Minn. 2011) (quotation omitted). "Structural error consists of defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards because the entire conduct of the trial from beginning to end is obviously affected." *Id.* For instance, the violation of a defendant's right to a public trial is a structural error. *State v. Bobo*, 770 N.W.2d 129, 139 (Minn. 2009). Structural error is not

16

subject to a harmless-error standard of review, meaning a defendant need not show that the structural error was prejudicial. *See State v. Petersen*, 933 N.W.2d 545, 551 (Minn. App. 2019).

Because the district court's ruling on the jury polling affected only Melina's presence *after* the jury verdict had already been read, we are not persuaded that the district court's ruling affected "the entire conduct of the trial from beginning to end." *Dalbec*, 800 N.W.2d at 627. We are also unaware of any decision holding that a defendant's absence from jury polling amounts to structural error. Accordingly, we reject Melina's structural-error argument.

## IV. The district court did not abuse its discretion by summarily denying Melina's petition for postconviction relief.

A person convicted of a crime may seek postconviction relief by filing a petition alleging that the conviction "violated the person's rights under the Constitution or laws of the United States or of the state." Minn. Stat. § 590.01, subd. 1(1) (2022). The postconviction court must hold an evidentiary hearing "[u]nless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief." Minn. Stat. § 590.04, subd. 1 (2022); *see also Jackson v. State*, 927 N.W.2d 308, 312 (Minn. 2019). When determining whether the petitioner is entitled to an evidentiary hearing, the postconviction court is required to consider the facts alleged in the petition as true and construe them in the light most favorable to the petitioner. *Andersen v. State*, 913 N.W.2d 417, 422-23 (Minn. 2018). We review the summary denial of a postconviction

petition for an abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo. *Riley v. State*, 819 N.W.2d 162, 167 (Minn. 2012).

Melina argues that the postconviction court abused its discretion when it denied his petition without holding an evidentiary hearing because his petition alleged a *Brady* violation by the prosecution. In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87 (1963). The Minnesota supreme court has adopted *Brady* and its progeny, which outline three elements for a *Brady* violation: (1) "the evidence at issue must be favorable to the accused, either because it is exculpatory or it is impeaching," (2) "the evidence must have been suppressed by the state, either willfully or inadvertently," and (3) the evidence must be material, meaning there is a reasonable probability that its suppression altered the outcome of the proceeding. *Pederson v. State*, 692 N.W.2d 452, 459-60 (Minn. 2005) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999), *Giglio v. United States*, 405 U.S. 150, 154 (1972), and *United States v. Bagley*, 473 U.S. 667, 682 (1985)).[1] A defendant "must meet all three requirements to establish a *Brady* violation." *Zornes v. State*, 903 N.W.2d 411, 417 (Minn. 2017).

Melina contends that his postconviction petition demonstrates the state violated *Brady* by failing to disclose the following evidence: (1) a psychotherapy note wherein

---

[1] The first two prongs of the *Brady* test are incorporated in the Minnesota Rules of Criminal Procedure. *See* Minn. R. Crim. P. 9.01, subd. 1(2), (6); *see also Pederson*, 692 N.W.2d at 460.

A.M. "indicated that she agreed to lie about her father so she would be able to return to her mother's home," (2) audio recordings made by Melina that he originally provided to the state, and (3) child-protection reports that allegedly indicate A.M. was willing to lie about Melina to be reunited with her mother. We conclude that the postconviction court did not abuse its discretion by summarily denying Melina's petition for relief. We discuss each piece of evidence in turn.

### A.    The Psychotherapy Note

The psychotherapy note was generated during one of A.M.'s therapy sessions. The postconviction court reviewed the psychotherapy note and found that a fax number at the top of the document indicated that it was faxed to Wright County Child Protection on July 20, 2017, two years prior to A.M.'s disclosure and the criminal case against Melina. The postconviction court also found that a footer on the document showed that it was emailed "to an unknown individual nearly a year after the trial." The postconviction court concluded that "[n]one of this information substantiate[d] [Melina's] claim that the [note] was in the prosecutor's possession," and therefore that Melina could not meet *Brady*'s second prong—namely, whether the state suppressed the note.

Melina argues that the postconviction court abused its discretion because "[i]t is clear from this note that it was in the possession of Wright County." The scope of the prosecution's duty to disclose exculpatory evidence is limited to "information *in the possession or control* of members of the prosecution staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report, or with reference to the particular case have reported, to the prosecutor's office." Minn. R.

Crim. P. 9.01, subd. 1a(1) (emphasis added). Moreover, the rules provide criminal defendants with an alternate mechanism to obtain information possessed by other governmental agencies, but not within the prosecutor's control. *See* Minn. R. Crim. P. 9.01, subd. 2(1). Based on our review, nothing in the record supports Melina's assertion that the prosecution possessed or controlled the psychotherapy note. Wright County Child Protection's potential possession of the psychotherapy note in 2017, without more, is not sufficient to establish that the note was in the "possession or control of members of the prosecution staff" or of any others who participated in the criminal investigation following the report of abuse by A.M. in 2019. Accordingly, the postconviction court did not abuse its discretion by summarily denying Melina's petition for relief in regard to the psychotherapy note.

### B. The Audio Recordings

Melina also argues that the state failed to produce recordings that Melina made of conversations between himself and A.M. The postconviction court concluded that there was no *Brady* violation with respect to the recordings because the evidence was "created by [Melina], supplied to the prosecutor by [Melina], and clearly known to subsequently appointed defense counsel." Melina does not dispute that he created the recordings and provided the recordings to the state. But Melina claims the postconviction court should have held an evidentiary hearing because "the record does not reflect whether the recordings were returned [to him] as ordered."

"When information is readily available to the defendant, it is not *Brady* material, and the prosecution does not violate *Brady* by not discovering and disclosing the

20

information." *United States v. Jones*, 34 F.3d 596, 600 (8th Cir. 1994). Here, the record undisputedly supports the postconviction court's determination that Melina had possession of the audio recordings prior to trial. First, testimony at trial established that Melina made the recordings and gave them to police and the prosecution in July 2019 and December 2019, respectively. Second, Melina's attorney filed an exhibit list for trial, which listed two audio recordings, titled "visit with [A.M.] 7-26-17 LASTvISIT" and "admitting-lieing-[A.M.]-mad-for-visiting-issues," as exhibits.[2] And third, during opening statements, Melina's attorney indicated that the jury would hear recordings of A.M. threatening to lie to the police so that she could be with her mother.

Thus, the record demonstrates that Melina had possession of the recordings prior to trial. Moreover, there is nothing in the record to support Melina's claim on appeal that the prosecution was "ordered" to return any recordings. For these reasons, we agree with the postconviction court that the audio recordings were not *Brady* material. The postconviction court did not abuse its discretion by summarily rejecting Melina's petition for relief regarding the audio recordings.

### C. The Child-Protection Reports

Lastly, Melina argues that the state's alleged suppression of "child protection reports" constituted a *Brady* violation. The postconviction court determined that no violation occurred because Melina was a party to the child-protection proceedings, and

---

[2] In his memorandum in support of his postconviction petition, Melina stated that he "found a portion of [the recordings] on his Google Drive and notified his counsel one week prior to trial."

therefore "had independent access to those records." The postconviction court also noted that the record demonstrated Melina was aware of the existence of the records, thereby undercutting his *Brady* claim. Additionally, in his pretrial exhibit disclosures, Melina disclosed "filings from family law cases."

Melina does not dispute the postconviction court's findings, and instead asserts that the reports "were never provided to the defense." We conclude that the child-protection reports were not *Brady* material—and so the state was not obligated to produce them—for the same reasons that the audio recordings were not *Brady* material. Information that is readily available to a defendant does not implicate *Brady*. *Jones*, 34 F.3d at 600. We therefore conclude that the postconviction court did not abuse its discretion by summarily denying Melina's petition for postconviction relief.

**Affirmed.**